IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| Robert C. Brandriff; Kristen E. Brandriff; Richard K. Davenport individually ("Plaintiffs") individually and derivatively on behalf of the Dataw Island Owners' Association, Inc. ("DIOA"); and Richard K. Davenport individually and derivatively on behalf of the Dataw Island Club ("DIC"); and Robert C. Brandriff; Kristen E. Brandriff; and Richard K. Davenport individually and as representatives of an antitrust class;<br><br>                       Plaintiffs,<br><br>     vs.<br><br>Dataw Island Owners' Association, Inc., nominal defendant; Dataw Island Club, Inc., nominal defendant; Bruce "Skip" Adams; George Beck; Victor Brinkman; Colin Collins; Earl Dietz; Merwin "Mer" Grayson; Dan Hopkins; Herb Jarvis; John Mahoney; Colin McArthur; Peter Payne; John Payne; Bob Sanderson; Lee Scher; Deirdre Smith; Bob Spengler; Phil Sutphin; Ray Hoge; Pam Weigand; Jim Smithson; Peter Post; Roger Rittinger; Gabriel Nagy; Bob Albon; Larry Bernard; Harriette Buchanan; Gary Davis; Keith Dixon; Dan Frakes; Jack Hamilton; Jerry Hubbard; Gwen Jordan; Larry Lance; Terry Lurtz; Jim Marks; Jim McCornock; Bob Pogachnick; Bob Tisch; Richard Warden; Tom Fischer; Rick Manzari; Susan Beekman; Timothy McGrath; Joe Foutch; Thomas White; Herman Schmit; D. Pierre Cameron, Jr.; and William Bush;<br><br>                       Defendants. | Civil Action No. _____<br><br><br><br>**VERIFIED COMPLAINT**<br><br><br><br><br><br><br><br><br>Jury Trial Requested |

Plaintiffs Robert C. Brandriff, Kristen E. Brandriff and Richard K. Davenport, ("Plaintiffs"), by and through their undersigned attorneys, individually, derivatively on behalf of the Dataw Island Owners' Association ("DIOA"), as to Davenport derivatively on behalf of the Dataw Island Club, Inc. ("DIC"), and as representatives of an antitrust class submit this Verified Complaint and allege upon personal knowledge as to their own acts, and upon information and belief as to all other matters:

### NATURE OF THE SHAREHOLDER DERIVATIVE ACTIONS
### DIOA SHAREHOLDERS' DERIVATIVE ACTION

1. This is a shareholders' derivative action brought by Plaintiffs in the name and for the benefit of nominal defendant DIOA against certain current and former Board members, namely Bruce "Skip" Adams; George Beck; Victor Brinkman; Colin Collins; Earl Dietz; Merwin "Mer" Grayson; Dan Hopkins; Herb Jarvis; John Mahoney; Colin McArthur; Peter Payne; John Payne; Bob Sanderson; Lee Scher; Deirdre Smith; Bob Spengler; Phil Sutphin; Ray Hoge; Pam Weigand; Jim Smithson; Peter Post; Roger Rittinger; and Gabriel Nagy (collectively "DIOA Board Defendants"). This action arises from DIOA Board Defendants' breach of their fiduciary, common law and statutory duties and violations of other laws causing damage to DIOA.

2. In gross breach of their duties as officers and/or directors, the DIOA Board Defendants conspired with one another and with various members of the Board of the DIC to:

   a. Implement policies to benefit DIC members at the expense of Dataw Island property owners who were not or did not wish to be DIC members;

b. Raise capital through the imposition of *ultra vires* assessments on DIOA members with intent to transfer that capital to the DIC for the improper purpose of supplementing the operations of the DIC and the lifestyles of its golfing members;

c. Create an illegal tying arrangement in restraint of trade in club memberships in the relevant market by conditioning the purchase and ownership of Dataw Island real estate upon the purchase of a DIC membership and/or payment of illegal assessments in violation of state and federal antitrust laws;

d. Create an implied exclusive dealing arrangement in restraint of trade in club memberships by restricting  Dataw Island residents from joining clubs other than the DIC;

e. Misrepresent to the DIOA membership through various written and oral presentations that the assessments and tying arrangements would enhance property values, provide the DIOA members with enhanced dining and recreational facilities, and be responsive to the expected growth of the Island;

f. Conceal and ignore conflicts of interest of those defendants who serve on the DIOA and who also are golfing members of the DIC when considering actions that benefited the DIC at the expense of  the DIOA;

g. Fail and refuse to honor the obligation of the Board to share information properly requested by members of the DIOA;

h. Cause to be commenced a lawsuit against Alcoa South Carolina, Inc. ("ASCI") for improper purposes and at substantial cost to DIOA and its members.

3.  As a result of the DIOA Board Defendants' egregious misconduct, DIOA has sustained substantial damages, and the Defendants have garnered unlawful revenue in excess of $75,000.

## DIC DERIVATIVE ACTION

4.  This is a shareholders' derivative action brought by Plaintiff Richard K. Davenport in the name of and for the benefit of nominal defendant DIC against certain current and former Board members, namely Bob Albon; Larry Bernard; Harriette Buchanan; Pete Cameron; Gary Davis; Keith Dixon; Dan Frakes; Jack Hamilton; Jerry Hubbard; Gwen Jordan; Larry Lance; Terry Lurtz; Jim Marks; Jim McCornock; Bob Pogachnick; Peter Post; Lee Scher; Deirdre Smith; Bob Tisch; Richard Warden; Tom Fischer; Rick Manzari; Susan Beekman; Timothy McGrath; Joe Foutch; Thomas White; Herman Schmit; D. Pierre Cameron, Jr., and William Bush (collectively "DIC Board Defendants").  The action arises from DIC Defendants' breach of their fiduciary, common law and statutory duties and violations of other laws causing damage to DIC.

5.  In gross breach of their  duties as officers and/or directors, the DIC Board Defendants conspired with one another and with various members of the Board of the DIOA to:

    a.  Cause to be commenced an unauthorized and *ultra vires* lawsuit against ASCI which was unreasonable under the circumstances and which was undertaken through bad faith, dishonesty, or incompetence and was not in the best interests of DIC or its shareholders;

    b.  Cause to be commenced a lawsuit on behalf of DIOA against ASCI for the improper purpose of assisting the ulterior goals of DIC in its litigation with ASCI;

    c.  Raise capital through the imposition of  *ultra vires* assessments on DIOA members with intent to transfer that capital to the DIC for the improper purpose of supplementing the operations of the DIC and the lifestyles of its golfing members;

4

d.  Create an illegal tying arrangement in restraint of trade in club memberships in the relevant market by conditioning the purchase and ownership of Dataw Island real estate upon the purchase of a DIC membership in violation of state and federal antitrust laws;

e.  Create an implied exclusive dealing arrangement in restraint of trade in club memberships by restricting Dataw Island residents from joining clubs other than the DIC;

f.  Misrepresent to the DIOA membership through various written and oral presentations that the assessments and tying arrangements would enhance property values, provide DIOA members with enhanced dining and recreational facilities, and be responsive to the expected growth of the Island;

g.  Knowingly, or with reckless disregard, ignore the existence of, or act in violation of, a conflict of interest as to those defendants who serve on the DIOA and who also are golfing members of the DIC;

h.  Fail and refuse to honor the obligation of the Board to share information properly requested by members of the DIC; and

i.  Restrain competition in the relevant market for memberships in golf and social/recreation clubs.

6.  As a result of the DIC Board Defendants' egregious misconduct, DIC has sustained substantial damages in excess of $75,000.

## NATURE OF THE ANTITRUST ACTION

7.  The Complaint also asserts antitrust class action claims arising under Sections 1 and 2 of the Sherman Act 15 U.S.C. 1, Sections 4 and 16 of the Clayton Act 15 U.S.C. § 15(a) and § 26.

8. This antitrust class action lawsuit is brought to stop and reverse the injustice caused by an unlawful conspiracy between the DIOA Boards of Directors and the DIC Board of Directors. The Boards of these two entities and their individual members (referred to herein alternatively as "Defendants" and/or "Boards") have conspired to raise capital through the imposition of *ultra vires* assessments on DIOA members for the improper purpose of supplementing the revenue of theDIC and the lifestyles of its golfing members and restraining trade in golf and social club memberships in the Dataw Island residential community.  As a result of the conspiracy between Defendants to restrain competition over a period of years, homeowners at Dataw Island have suffered significant damages, including forced payment of illegally imposed dues, assessments, other costs of membership, and reduced property values.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1331 and 1337(a).

10. This Court also has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which, inter alia, amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiff's is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interests and costs. See 28 U.S.C. § § 1332(d)(2) and (6).

11. This Court has supplemental jurisdiction over claims arising under South Carolina state law pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants either resides in or maintains executive offices in this District, and a substantial part

of the wrongs complained herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.

## PARTIES

### Plaintiffs

13. Robert C. Brandriff and Kristen E. Brandriff ("Brandriffs"), husband and wife, purchased a home on Dataw Island on April 1, 2001.  Brandriffs are members in good standing of the DIOA.  Brandriffs are citizens and residents of the State of Connecticut.  For the purposes of this Verified Complaint, Brandriffs are plaintiffs individually as well as plaintiffs in the DIOA derivative suit brought herein, and are Class Representatives in the Antitrust Class Action.

14. Richard K. Davenport ("Davenport") purchased a home on Dataw Island on January 10, 2003, and continues to own this property.  Davenport is a member in good standing of the DIOA and of the DIC.  For the purposes of this Verified Complaint, Davenport is a plaintiff individually as well as a plaintiff in both derivative suits brought herein, and is a Class Representative in the Antitrust Class Action.

### Nominal Defendants

15. DIOA is a non-profit corporation organized under the laws of the State of South Carolina, with its principal place of business in the County of Beaufort, State of South Carolina.  DIOA was created to maintain permanent open spaces and pedestrian walkways, own and acquire certain real property, build and oversee the management of improvements thereon, pay all applicable taxes and enforce any and all covenants and restrictions and agreements applicable to Dataw Island.

16. DIC is a not-for-profit corporation organized under the laws of the state of Florida, with its principal place of business in the County of Beaufort, State of South Carolina. DIC was formed to operate the recreational facilities, including two eighteen-hole golf courses, located on Dataw Island, South Carolina.

### Individual Defendants

17. The individuals named below as the DIOA Board Defendants and the DIC Board Defendants are referred to collectively herein as the "Individual Defendants."

### DIOA Board of Directors and Officers
("DIOA Board Defendants")

18. Bruce "Skip" Adams is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

19. George Beck is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

20. Victor Brinkman is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

21. Colin Collins is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

22. Earl Dietz is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

23. Merwin "Mer" Grayson is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

24. Dan Hopkins is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

25. Herb Jarvis is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

26. John Mahoney is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

27. Colin McArthur is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

28. Peter Payne is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

29. John Payne is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

30. Bob Sanderson is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

31. Lee Scher is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

32. Deirdre Smith is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

33. Bob Spengler is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

34. Phil Sutphin is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

35. Ray Hoge is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

36. Pam Weigand is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

37. Jim Smithson is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

38. Peter Post is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

39. Roger Rittinger is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

40. Gabriel Nagy is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

41. John Doe #1 is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

42. John Doe #2 is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

43. John Doe #3 is or was, during the relevant time period, a member and/or officer of the Board of DIOA.

## DIC Board of Directors and Officers

("DIC Board Defendants")

44. Bob Albon is or was, during the relevant time period, a member and/or officer of the Board of DIC.

45. Larry Bernard is or was, during the relevant time period, a member and/or officer of the Board of DIC.

46. Harriette Buchanan is or was, during the relevant time period, a member and/or officer of the Board of DIC.

47. Gary Davis is or was, during the relevant time period, a member and/or officer of the Board of DIC.

48. Keith Dixon is or was, during the relevant time period, a member and/or officer of the Board of DIC.

49. Dan Frakes is or was, during the relevant time period, a member and/or officer of the Board of DIC.

50. Jack Hamilton is or was, during the relevant time period, a member and/or officer of the Board of DIC.

51. Jerry Hubbard is or was, during the relevant time period, a member and/or officer of the Board of DIC.

52. Gwen Jordan is or was, during the relevant time period, a member and/or officer of the Board of DIC.

53. Larry Lance is or was, during the relevant time period, a member and/or officer of the Board of DIC.

54. Terry Lurtz is or was, during the relevant time period, a member and/or officer of the Board of DIC.

55. Jim Marks is or was, during the relevant time period, a member and/or officer of the Board of DIC.

56. Jim McCornock is or was, during the relevant time period, a member and/or officer of the Board of DIC.

57. Bob Pogachnick is or was, during the relevant time period, a member and/or officer of the Board of DIC.

58. Peter Post is or was, during the relevant time period, a member and/or officer of the Board of DIC.

59. Lee Scher is or was, during the relevant time period, a member and/or officer of the Board of DIC.

60. Deirdre Smith is or was, during the relevant time period, a member and/or officer of the Board of DIC.

61. Bob Tisch is or was, during the relevant time period, a member and/or officer of the Board of DIC.

62. Richard Warden is or was, during the relevant time period, a member and/or officer of the Board of DIC.

63. Tom Fischer is or was, during the relevant time period, a member and/or officer of the Board of DIC.

64. Rick Manzari is or was, during the relevant time period, a member and/or officer of the Board of DIC.

65. Susan Beekman is or was, during the relevant time period, a member and/or officer of the Board of DIC.

66. Timothy McGrath is or was, during the relevant time period, a member and/or officer of the Board of DIC.

67. Joe Foutch is or was, during the relevant time period, a member and/or officer of the Board of DIC.

68. Thomas White is or was, during the relevant time period, a member and/or officer of the Board of DIC.

69. Herman Schmit is or was, during the relevant time period, a member and/or officer of the Board of DIC.

70. William Bush is or was, during the relevant time period, a member and/or officer of the Board of DIC.

71. D. Pierre Cameron, Jr. is or was, during the relevant time period, a member and/or officer of the Board of DIC.

72. John Doe #4 is or was, during the relevant time period, a member and/or officer of the Board of DIC.

73. John Doe #5 is or was, during the relevant time period, a member and/or officer of the Board of DIC.

74. John Doe #6 is or was, during the relevant time period, a member and/or officer of the Board of DIC.

## **FACTUAL ALLEGATIONS**

75. Alcoa South Carolina, Inc. ("ASCI") purchased Dataw Island in 1983 for the purpose of creating a mixed residential development and golf club.  It filed Declaration of Covenants, Restrictions and Conditions on June 15, 1984, subdivided the property, sold lots, and constructed two 18-hole golf courses and related structures.

76. ASCI formed DIOA on April 4, 1985 "to maintain permanent open spaces and pedestrian walkways, own and acquire certain real property, build and oversee the management of improvements thereon, pay all applicable taxes and enforce any and all covenants and restrictions and agreements applicable to Dataw Island."

77. On April 22, 1985, DIOA filed a Petition for Incorporation as Non-Profit Corporation for the stated purpose of providing for preservation of values and amenities and maintenance of common areas at Dataw Island.

78. On October 24, 1985, DIOA executed its initial By-laws.

79. On May 15, 1987, DIC was incorporated as a Florida not-for-profit corporation to operate and maintain golf courses, a clubhouse, and related recreational and social facilities on Dataw Island.

80. On October 1, 1996, Alcoa transferred control of DIC to holders of equity membership certificates pursuant to a Turnover Agreement.  Pursuant to the Turnover Agreement, ASCI retained ownership of all unsold A and B equity memberships in the DIC.

81. In conjunction with ASCI's transfer of control of DIC to the DIC membership in 1996, ASCI entered into a Subsidy Agreement whereby ASCI agreed to subsidize the DIC for its operating losses and capital expenditures up to a certain amount annually based on membership levels. The agreement obligated ASCI to provide this subsidy until DIC achieved a target of 500 A (golf) equity members paying full dues.  The amount of the subsidy was calculated to account for the difference between DIC actual revenue and the revenue that it would have received if it had 500 full dues paying golf equity members.  At the time, it was expected that DIC would reach the required number of equity members by the year 2000.

82. On October 1, 1996, the DIC Amended By-Laws became effective.

83. On October 1, 1996, Alcoa filed Amended and Restated Declaration of Covenants, Restrictions and Conditions for Dataw Island ("Restated Covenants").

84. The Restated Covenants included, in part, the following terms:

    a. Alcoa ceded the power to appoint the DIOA Board.

    b. The Restated Covenants allow assessments for "repairing private streets, walkways and like community areas, private lighting systems, storm drainage and other non-publicly owned or political bodies' grounds, maintenance building(s) and related property, security and cable television lines, maintaining the waterfront, lagoons and other bodies of water ..., repairing damage caused by common area erosion, replacing any existing landscaping; providing for pest control when needed; and for the general purposes of

15

promoting the recreation, health, safety, welfare, common benefit, and enjoyment of the Owners and occupants of the Development, and maintaining the Development and improvements therein, providing those services important to the development and preservation of an attractive community appearance, and, maintaining the privacy, security and general safety of the owners and occupants of the development; all as may be more specifically authorized from time to time by the Board of Directors."

c.  The Restated Covenants allow Annual Assessments to be imposed on owners and the Golf Club for Common Expenses.

d.  The duties and powers of the Association were defined to include those set forth in the provisions of the South Carolina Code relating to nonprofit corporations, the Restated Covenants, the By-Laws, and the Articles of Incorporation, "together with those reasonably implied to effect the purposes of the Association." The Restated Covenants provided the Association "may exercise any other right or privilege given to it expressly by this Declaration or by law, together with every other right or privilege given to it herein or reasonably necessary to effectuate any such right or privilege." These generalized purported grants of corporate power are too vague to be enforceable.

e.  Special Assessments were authorized upon a majority vote of the Owners.

85. On November 1, 1997, the DIOA approved Amended and Restated By-Laws. The Amended and Restated By-Laws included, in part, the following provisions:

a.  A member may examine but not copy accounts and records of the DIOA.

b.  The DIOA responsibilities:  include preserving and enhancing amenities ; maintaining the natural beauty and harmony of the Island;  promoting the safety, health and welfare

of residents;  promoting the common benefit and enjoyment of the Property;  and

promoting the financial welfare of the Association through forecasting, planning and

careful administration of DIOA funds.

c.   Board members are not allowed compensation in any form for service.

d.   No capital expenditure over $100,000 is allowed without approval of 75% of the

membership of the DIOA  and no unsecured indebtedness in excess of $100,000 without

the prior approval of 75% of the membership

86. In 2000, the DIC and DIOA began a conspiracy designed to siphon funding from the DIOA

membership to bolster the DIC and to restrain competition in golf and social club memberships

in the market by initiating a program they called the "One Island" Concept.  The Boards

represented that "After a lengthy study that included many discussions with outside experts,

both Boards unanimously concluded that the Club should provide all recreational and social

amenities and that a new Social membership obligation should be established."   The Boards

misrepresented that "these actions will enhance our property values, provide all of us with

enhanced dining and recreational facilities and be responsive to the expected growth of the

Island."

87. As a result of the misrepresentations of the Boards made to the DIOA membership through

various written and oral presentations, the membership voted at the Annual meeting on February

20, 2001, to adopt Amendment Number Three to the Restated Covenants to adopt the One

Island Concept.  Prior to the adoption of the One Island Concept, membership in DIC had been

optional for property owners at Dataw and available in two equity membership categories:  A

Class Golf and B Class Social.  As a result of the adoption of the One Island Concept, every

person who became an owner of a lot or dwelling at Dataw Island after May 31, 2001, was required to become a member of the DIC and a new class of non-equity membership was created. The creation of this new class of non-equity membership undermined the value of the previous equity memberships. The previous Class B Social equity membership was renamed as Sport and the new non-equity membership was now named Social.

88. The DIOA Board and the DIC Board jointly represented that the One Island Amendment would result in increased property values and that it would not lead to increased assessments for capital improvements at the DIC. Additionally they assured the existing and grandfathered non-DIC members that "They will not be charged for any amenity assessments or club dues."

89. This has not transpired. Instead, providing a less expensive membership option actually resulted in a decrease in the number of equity golf memberships.

90. The conspiracy between the Boards of the DIC and the DIOA to restrain trade in golf and social club memberships has been repeatedly demonstrated by the operation of these separate Boards as if they were one entity. The Boards have formed numerous joint committees for the purpose of conducting common DIC/DIOA planning activities, whose overriding purpose has been the promotion and artificial financial support of the DIC.

91. The One Island Concept has been used by the DIC and DIOA Boards as a vehicle for transferring funds from the DIOA membership to cover the costs of maintaining two 18-hole championship level golf courses at below market prices for members of the DIC. This conspiracy has resulted in giving the DIC an unfair competitive advantage vis-à-vis competing golf and social clubs by generating a stream of revenue unrelated to the competitive merits of the DIC operation.

92. After adoption of the One Island Concept and after improperly obtaining DIOA membership approval for the Concept, the DIC Board in December, 2005 quadrupled the social member initiation from $4,000 to $15,000.

93. Because purchasers of Dataw Island property after the adoption of the One Island Concept are required to purchase a DIC membership, the increases in dues have caused substantial de facto increases in the cost of each property sold on Dataw Island, which undermines the price competitiveness of property at Dataw.

94. In or around 2005, DIC became aware of ASCI's desire to cease its involvement with Dataw Island. At the time, the ASCI annual subsidy of DIC, pursuant to the Turnover Agreement, was approximately $855,000. ASCI entered into negotiations with DIC to begin ASCI's withdrawal from Dataw Island. Upon information and belief, as a result of those negotiations, ASCI offered to turn over to DIC their remaining interests on the island (unsold lots, etc.) valued roughly at about $3-4 million to facilitate its withdrawal and to provide monetary stability to DIC subsequent to that withdrawal. DIC declined the ASCI offer believing they could perpetually maintain the annual subsidy as long as they never reached 500 full dues paying golf members. DIC was also aware, upon information and belief, that ASCI had negotiated or was negotiating with a third party for the sale and transfer of ASCI's remaining property interests on Dataw Island.

95. Despite ASCI's offer and the knowledge that ASCI was involved in negotiations to sell its interests in Dataw Island to a third party, DIC, at the direction of its Board of Directors, initiated a lawsuit against ASCI over ASCI's actions in marketing and selling DIC golf memberships. As a direct result of the initiation of this suit, ASCI terminated the payment of the annual subsidy, withdrew its offer, and, filed a counterclaim against DIC in the amount of $3.75

million, plus costs and attorney's fees, for tortious interference with the prospective buyer of ASCI's remaining Dataw Island Property.

96. Davenport purchased property at 1352 Rowland Drive in Dataw Island on January 10, 2003. As a property owner at Dataw, he was required to join the DIOA. He was not informed until after his purchase that he would be required to also join DIC. In compliance with this obligation, Davenport joined the DIC as a social member, paying an initiation fee of $4,000.00.

97. The Brandriffs purchased property at 433 B.B. Sams Drive in Dataw Island on April 1, 2001. They were not informed that the One Island Concept had been approved prior to their purchase and was to go into effect approximately 60 days after the date of purchase, thereby influencing the future resale of their property.

98. In December 2004, the DIC and DIOA Boards conspired to impose a "Greenspace Assessment" on every member of the DIOA, regardless of whether they were golfing members of the DIC or even members of the DIC in any way. This assessment was represented as "a contribution to the significant cost of maintaining Dataw's number one amenity, and to continue to help protect and enhance property values on the Island."

99. The Conspiring Boards of the DIC and DIOA included this assessment in the 2005 Annual DIOA budget, rather than proposing it for a special assessment vote as required by the DIOA By-Laws. According to the joint statement of the Boards, "the Greenspace concept can stand alone, and after very thorough discussions by both boards, we decided to present the concept to property owners as part of the 2005 DIOA budget process."

100.    Based upon the fraudulent misrepresentations of the DIOA and DIC Boards, the DIOA membership voted to approve the 2005 budget, which included the initial Greenspace

20

Assessment. This vote is null and void because it was procured by fraudulent means and it was not conducted in accordance with the By-Laws of the DIOA.

101. Substantial capital was raised by the Greenspace assessment in 2005, 2006 and 2007. Upon information and belief, the capital raised by the DIOA Greenspace Assessment in each year has been donated in full to the DIC to supplement its operations.

102. The promotional materials for the Greenspace Assessment represented that, in the absence of the assessment, "[g]olf membership dues would have to increase to an amount in excess of $500 per month if no reduction in the golf budget was made."

103. The DIOA Board at all pertinent times was composed of DIC members, who upon information and belief, did not recuse themselves from the approval process on the basis of their conflict of interest in appropriating DIOA funds to maintain artificially low membership fees for DIC golfing members.

104. The DIOA Board members who were golfing members of the DIC had a conflict of interest in relation to adoption of the One Island Concept and the imposition of the Greenspace Assessment.

105. The DIOA Board and the DIC Boards have conducted much of their most important deliberations under a cloak of secrecy. As a part of their conspiracy, the Boards have regularly and systematically denied lawful, reasonable requests from the membership for information regarding Board deliberations and decisions.

106. At all material times hereto, each of the DIOA Board Defendants was the agent of each of the other Individual Defendants and of DIOA, and was at all times acting within the course and scope of said agency.

107.    At all material times hereto, each of the DIC Board Defendants was the agent of each of the other Individual Defendants and of DIC, and was at all times acting within the course and scope of said agency.

108.    The Individual Defendants breached their statutory duties, fiduciary duties, duties of good faith and loyalty, and the business judgment rule by allowing other Individual Defendants to cause or by themselves causing, conspiring to cause, and/or aiding and abetting,  the conspiracy to cause DIOA to enter into the illegal contract, combination and conspiracy with the Board of the DIC as detailed herein, or by failing to prevent other Individual Defendants from taking such illegal actions.

109.    The DIOA Board Defendants, in breach of their duties, authorized, caused, aided and abetted,  and/or permitted DIOA to raise capital through the imposition of *ultra vires* assessments on the DIOA membership which served no legitimate corporate purpose; and authorized, caused, aided and abetted,  and/or permitted DIOA to conduct its business in an imprudent and unlawful manner by entering into an illegal contract, combination or conspiracy to restrain trade, all for their personal profit and to the detriment of the DIOA and its members.

110.    The DIC Board Defendants, in breach of their fiduciary duties, authorized, caused, aided and abetted,  and/or permitted DIC to accept revenue derived through *ultra vires* assessments on the DIOA membership and which served no legitimate corporate purpose; and permitted and/or authorized, caused, aided and abetted,  and/or permitted DIC to conduct its business in an imprudent and unlawful manner by entering into an illegal contract, combination or conspiracy to restrain trade, all for their personal profit and to the detriment of the DIC and its members.

111.   The Individual Defendants participated in the wrongdoing complained of herein in order to improperly benefit themselves and to the detriment of others to whom they owed fiduciary duties, duties of good faith and loyalty and other statutory and common law duties.  Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of) and authorizing, approving, ratifying and acquiescing in the conduct complained of herein.

112.   By reason of their membership on the Board of Directors, the Individual Defendants were each controlling persons of DIOA and/or DIC and had the power and influence to cause, and did cause, those entities to engage in and/or permit the conduct complained of herein.

## DIOA DERIVATIVE ACTION ALLEGATIONS

113.   Plaintiffs bring this action derivatively on behalf and for the benefit of DIOA to redress injuries suffered, and yet to be suffered, by DIOA as a direct and proximate result of the breaches of the common law and statutory duties, violations of law, abuse of control, gross mismanagement and unjust enrichment by the DIOA Board Defendants. DIOA is named as a nominal defendant solely in a derivative capacity.

114.   Plaintiffs will adequately and fairly represent the interests of DIOA and its members in this litigation.

115.   Plaintiffs were and are owners of DIOA-controlled real estate and were and are members of DIOA during all times relevant to the DIOA Board Defendants' wrongful course of conduct alleged herein.

116.   The wrongful acts complained of herein subject, and will persist in subjecting, DIOA to continuing harm because the adverse consequences of the injurious actions are still in effect.

117.    The complained of actions by the DIOA Board Defendants are not authorized by the By-laws of the DIOA or Amended Restated Restrictive Covenants for the subdivision of Dataw Island and therefore are *ultra vires,* unlawful, unauthorized and incapable of ratification. Accordingly, the actions complained of herein are not protected by the business judgment rule, and any reasonable, good faith inquiry into this wrongdoing would conclude that Plaintiffs' claims should be pursued and are in the best interests of DIOA.

118.    The wrongful acts complained of herein were self-dealing, egregious, outside the scope of the Board of Directors' authority, and served no legitimate business purpose. Such acts were not, nor could they have been, the product of a valid, reasonable or good faith exercise of business judgment.

119.    This action is not a collusive one designed to confer the District Court with jurisdiction it would otherwise not have.

## DIOA DEMAND ALLEGATIONS

120.    The present Board of Directors of DIOA consists of five (5) members:  Defendants Beck, Collins, McArthur, Nagy, and Sutphin.  Plaintiffs have not made any demand on the present Board of Directors of DIOA to institute this action because such a demand would be a futile, wasteful and useless act.  The directors are antagonistic, adversely interested, and involved in the transactions complained of herein.

121.    Because each director is interested and not independent, he or she could not fairly and fully prosecute a suit even if such suit was instituted by them.

122.    The members of the DIOA Board of Directors participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise the wrongs from

DIOA members or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein and therefore are not disinterested parties. As a result of their access to and review of internal corporate documents, communications with corporate officers and attendance at management and Board meetings, each director of DIOA had actual or constructive knowledge regarding the illegal conduct at issue.

123. As a director of DIOA, each Board member had and has specific duties he owed to DIOA and its members. In breach of these specific duties, each Board member, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise those wrongs from DIOA's members or recklessly and/or negligently disregarded the wrongs complained of herein. Therefore, members of the Board cannot exercise independent objective judgment in deciding whether to institute or vigorously prosecute this action because each Board member is interested personally in the outcome of such an action, as it is his actions that have played a part in subject DIOA to liability for potential violations of applicable laws.

124. In order to bring this suit, all of the directors of DIOA would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing the demand.

## DIC DERIVATIVE ACTION ALLEGATIONS

125. Plaintiff Davenport, as a present member of DIC, brings this action derivatively on behalf and for the benefit of DIC to redress injuries suffered, and yet to be suffered, by DIC as a direct and proximate result of the breaches of common law and statutory duties, violations of law,

abuse of control, gross mismanagement and unjust enrichment by the DIC Board Defendants. DIC is named as a nominal defendant solely in a derivative capacity.

126.    Plaintiff Davenport will adequately and fairly represent the interests of DIC and its members in this litigation.

127.    Plaintiff Davenport was and is an owner and member of DIC during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

128.    The wrongful acts complained of herein have subjected DIC to harm.

129.    The wrongful acts complained of herein are *ultra vires,* unlawful, unauthorized and incapable of ratification.  Accordingly, the actions complained of herein are not protected by the business judgment rule, and any reasonable, good faith inquiry into this wrongdoing would conclude that Plaintiffs' claims should be pursued and are in the best interests of DIC.

130.    The wrongful acts complained of herein were self-dealing, egregious, outside the scope of the Board of Directors' authority, and served no legitimate business purpose. Such acts were not, nor could they have been, the product of a valid, reasonable or good faith exercise of business judgment.

131.    This action is not a collusive one designed to confer the District Court with jurisdiction it would otherwise not have.

## DIC DEMAND ALLEGATIONS

132.    The present Board of Directors of DIC consists of  nine (9) members:  Defendants Beekman, Bernard, Bush, McGrath, Schmitt, Smith, Foutch, Lurtz, and White.  Plaintiffs have not made any demand on the present Board of Directors of DIC to institute this action because such a

demand would be a futile, wasteful and useless act.  The directors are antagonistic, adversely interested, and involved in the transactions complained of herein.

133.    Because each director is interested and not independent, he or she could not fairly and fully prosecute a suit even if such suit was instituted by them.

134.    The members of the DIC Board of Directors participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise the wrongs from DIC members or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein and therefore are not disinterested parties.  As a result of their access to and review of internal corporate documents, communications with corporate officers and attendance at management and Board meetings, each director of DIC had actual or constructive knowledge regarding the illegal conduct at issue.

135.    As a director DIC, each Board member had and has specific duties he owed to DIC and its members.  In breach of these specific duties, each Board member, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise those wrongs from DIC's members or recklessly and/or negligently disregarded the wrongs complained of herein.  Therefore, members of the Board cannot exercise independent objective judgment in decided whether to institute or vigorously prosecute this action because each Board member is interested personally in the outcome of such an action, as it is his actions that have played a part in subject DIC to liability for potential violations of applicable laws.

136.    In order to bring this suit, all of the directors of DIC would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing the demand.

## DERIVATIVE CAUSES OF ACTION BY AND ON BEHALF OF THE DIOA MEMBERS
### COUNT I:  BREACH OF FIDUCIARY, STATUTORY, AND COMMON LAW  DUTIES
(Against the DIOA Board Defendants)

137.    Plaintiffs incorporate by reference and allege each and every allegation contained above, as though fully set forth herein.

138.    As alleged herein the DIOA Board Defendants owed and owe the DIOA fiduciary, common law and statutory duties.  By reason of their service as Directors, the DIOA Board Defendants owed and owe DIOA fiduciary duties, the obligation to act in good faith, with the degree of care an ordinarily prudent director would exercise under similar circumstances, and in a manner they reasonably believe to be in the best interests of the corporation and its shareholders.

139.    The DIOA Board, collectively and as individual members, violated their duties as follows:

a.    By instituting the One Island Concept and thereby forcing purchasers of property at Dataw Island to join the DIC;

b.    By misrepresenting the One Island Concept as an advantageous strategy to improve property values at Dataw Island, when in reality the Concept was to be used as a means to siphon funds from DIOA members to support the DIC, a separate and independent entity;

c.    By entering into a contract, combination or conspiracy in restraint of trade in golf and social club memberships with the DIC, including a tying arrangement, an implied

exclusive dealing arrangement and an attempt to monopolize the market for golf and
social club memberships in the Dataw Island market in violation of federal and state
antitrust laws, as set forth in greater particularity below;

d.  By entering into an unlawful civil conspiracy with the DIC to damage members of the
DIOA who did not wish to become members of the DIC;

e.  By imposing the *ultra vires* Greenspace Assessment in 2005, 2006, 2007, as well as in
future years after the initiation of this complaint, on the membership of the DIOA for the
purpose of supporting the DIC and keeping costs of golfing at the DIC artificially low;

f.  By fraudulently misrepresenting and/or concealing their intention to utilize the non-golf
memberships in DIC to substantially subsidize the golf operations; the truth of which did
not become apparent until the DIC fees and dues were dramatically increased in
December 2005;

g.  By allowing, enforcing, and failing to control raising costs associated with the DIOA
members' mandatory membership in the DIC, including food costs, dues, and initiation
fees; and

h.  By failing to timely and properly respond to proper requests for information and by
hindering plaintiffs' efforts to gather information related to these actions.

140.  Each of the DIOA Board Defendants knew, should have known, or recklessly disregarded
that the DIOA Board Defendants violated and breached their fiduciary duties of care, good faith,
loyalty, reasonable inquiry, oversight and supervision.

141.  Each of the DIOA Board Defendants had actual or constructive knowledge that he or she
had caused the Association to improperly represent the prospects of the One Island Concept and

failed to correct the Association's reported findings.  These actions could not have been in a

good faith exercise of prudent business judgment to protect and promote the Association's

interests.

142.    These breaches amount to wilful, wanton, grossly negligent conduct.

143.    As a direct and proximate result of the DIOA Board Defendants' failure to perform their

statutory and common law duties the DIOA and the plaintiffs individually have suffered

significant damages.

144.    As a direct and proximate result of the misconduct alleged herein, the DIOA Board

Defendants are liable to the Company and to the individual plaintiffs.

### *COUNT II:  GROSS MISMANAGEMENT*
(Against the DIOA Board Defendants)

145.    Plaintiffs incorporate by reference and allege each and every allegation contained above, as

though fully set forth herein.

146.    By their actions and/or inaction alleged herein, the Individual Defendants, directly,

indirectly, knowingly, willfully, wantonly, in a grossly negligent manner, and/or intentionally

through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

obligations with regard to the prudent management of DIOA in a manner consistent with the

operations of a homeowners' association in the following ways:

    a.    By instituting the One Island Concept and thereby forcing purchasers of property at

        Dataw Island to join the DIC;

    b.    By misrepresenting the One Island Concept as an advantageous strategy to improve

        property values at Dataw Island, when in reality the Concept was to be used as a means

to siphon funds from DIOA members to support the DIC, a separate and independent entity;

c.  By entering into a contract, combination or conspiracy in restraint of trade in golf and social club memberships with the DIC, including a tying arrangement, an implied exclusive dealing arrangement and an attempt to monopolize the market for golf and social club memberships in the Dataw Island market in violation of federal and state antitrust laws, as set forth in greater particularity below;

d.  By entering into an unlawful civil conspiracy with the DIC to damage members of the DIOA who did not wish to become members of the DIC.

e.  By imposing the *ultra vires* Greenspace Assessment  in 2005, 2006, 2007, as well as in future years after the initiation of this complaint, on the membership of the DIOA for the purpose of supporting the DIC and keeping costs of golfing at the DIC artificially low;

f.  By fraudulently misrepresenting and/or concealing their intention to utilize the non-golf memberships in DIC to substantially subsidize the golf operations; the truth of which did not become apparent until the DIC fees and dues were dramatically increased in December 2005.

g.  By allowing, enforcing, and failing to control raising costs associated with the DIOA members' mandatory membership in the DIC, including food costs, dues, and initiation fees; and

h.  By failing to timely and properly respond to proper requests for information and by hindering plaintiffs' efforts to gather information related to these actions.

147.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, DIOA has sustained significant damages.

148.    As a direct and proximate result of the misconduct and breaches of fiduciary duty alleged herein, the Individual Defendants are liable to the Association and to the individual plaintiffs.

### COUNT III:  AIDING AND ABETTING A BREACH OF FIDUCIARY, STATUTORY AND COMMON LAW DUTIES
(Against the DIOA Board Defendants)

149.    Plaintiffs incorporate by reference and allege each and every allegation contained above as though fully set forth herein.

150.    By reason of their positions as DIOA Directors, the Individual Defendants owed duties of undivided loyalty, good faith, and truthful disclosure. The Individual Defendants violated and breached these duties in the following ways:

   a.    By instituting the One Island Concept and thereby forcing purchasers of property at Dataw Island to join the DIC;

   b.    By misrepresenting the One Island Concept as an advantageous strategy to improve property values at Dataw Island, when in reality the Concept was to be used as a means to siphon funds from DIOA members to support the DIC, a separate and independent entity;

   c.    By entering into a contract, combination or conspiracy in restraint of trade in golf and social club memberships with the DIC, including a tying arrangement, an implied exclusive dealing arrangement and an attempt to monopolize the market for golf and

social club memberships in the Dataw Island market in violation of federal and state antitrust laws, as set forth in greater particularity below;

d.  By entering into an unlawful civil conspiracy with the DIC to damage members of the DIOA who did not wish to become members of the DIC;

e.  By imposing the *ultra vires* Greenspace Assessment on the DIC in 2005, 2006, 2007, as well as in future years after the initiation of this complaint, on the membership of the DIOA for the purpose of supporting the DIC and keeping costs of golfing at the DIC artificially low;

f.  By fraudulently misrepresenting and/or concealing their intention to utilize the non-golf memberships in DIC to substantially subsidize the golf operations; the truth of which did not become apparent until the DIC fees and dues were dramatically increased in December 2005;

g.  By allowing, enforcing, and failing to control raising costs associated with the DIOA members' mandatory membership in the DIC, including food costs, dues, and initiation fees; and

h.  By failing to timely and properly respond to proper requests for information and by hindering plaintiffs' efforts to gather information related to these actions.

151.  By virtue of their role in administering DIOA regulations, and their approval and authorization of such regulations as the One Island Concept, the Individual Defendants were able to, and in fact did, render aid and assistance to the other Individual Defendants in their breach of fiduciary duty. The Individual Defendants did so knowing, or but for their gross negligence would have known, of the other Defendants' breach of fiduciary duty.

152.    This conduct amounted to wilful, wanton and grossly negligent conduct.

153.    As a direct and proximate result of the Individual Defendants' aiding and abetting each others' breach of fiduciary duty, DIOA and the plaintiffs, individually, have sustained, and will continue to sustain, substantial harm.

154.    The Individual Defendants are liable to DIOA and the individual plaintiffs as a result of the acts alleged herein.

## COUNT IV: UNLAWFUL DISTRIBUTION

(Against the DIOA Board Defendants)

155.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if here set forth in full.

156.    The DIOA Board Defendants, as alleged herein, have acted in bad faith, without exercising the care a reasonable director would in similar circumstances, and not in the best interests of DIOA and its members.

157.    The transfer of funds generated by the Greenspace Assessments to DIC constitutes a payment of corporation funds to the direct benefit of those DIOA Board members who are also DIC golf membership holders.

158.    This payment constitutes an unlawful distribution.

159.    Consequently, the individual DIOA Board Defendants who voted for or assented to these unlawful distributions are personally liable to the corporation for the monies paid from DIOA corporate funds.

## REQUEST FOR RELIEF ON BEHALF OF
## THE INDIVIDUAL PLAINTIFFS AND DIOA MEMBERS

WHEREFORE, Plaintiffs, individually and derivatively on behalf of DIOA and its members, demand judgment as follows:

A. Awarding to DIOA and the individual plaintiffs money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, including return of illegally imposed fees and assessments, decreased property values, delays in property sales, losses incident to the litigation against ASCI (including attorneys fees incurred and terminated subsidies and other financial benefits flowing from the ASCI relationship), and all other recoverable damages;

B. Awarding to DIOA restitution from each of the Individual Defendants and ordering disgorgement of all benefits, illegal distributions and/or other compensation obtained by the Individual Defendants as a result of the acts and transactions complained of herein;

C. Rescission of the unlawful tying arrangement mandate complained of herein and the cancellation, nullification, and declaration as void of this regulation;

D. Awarding punitive damages against the Individual Defendants;

E. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F. Granting such other relief as the Court may deem just and proper; and

G. Dissolution of the present DIOA Board and installation of an interim independent Board of Directors.

## DERIVATIVE CAUSES OF ACTION BY AND ON BEHALF OF THE DIC MEMBERS
### *COUNT IV:  BREACH OF FIDUCIARY DUTIES*
(Against the DIC Board Defendants)

160.   Plaintiffs incorporate by reference and allege each and every allegation contained above, as though fully set forth herein.

161.   As alleged herein the DIC Board Defendants owed and owe the DIC fiduciary, common law and statutory duties.  By reason of their service as Directors, the DIC Board Defendants owed and owe DIC fiduciary duties, the obligation to act in good faith, with the degree of care an ordinarily prudent director would exercise under similar circumstances, and in a manner they reasonably believe to be in the best interests of the corporation and its shareholders.

162.   The DIC Board, collectively and as individual members, violated their statutory, common law and fiduciary duties as follows:

    a.   By instituting and litigating a lawsuit against ASCI which served no legitimate business objective and which effectively terminated the ASCI annual subsidy, caused the withdrawal of ASCI's substantive offer , and subjected DIC to exposure of a $3.75 million counterclaim for interference with ASCI's prospective contract with a third party;

    b.   By conspiring with DIOA to institute the One Island Concept and thereby force purchasers of property at Dataw Island to join the DIC;

    c.   By conspiring with DIOA to misrepresent the One Island Concept as an advantageous strategy to improve property values at Dataw Island, when in reality the Concept was to

be used as a means to siphon funds from DIOA members to support the DIC, a separate and independent entity;

d.  By entering into a contract, combination or conspiracy in restraint of trade in golf and social club memberships with DIOA, including a tying arrangement, an implied exclusive dealing arrangement and an attempt to monopolize the market for golf and social club memberships in the Dataw Island market in violation of federal and state antitrust laws, as set forth in greater particularity below;

e.  By entering into an unlawful civil conspiracy with the DIOA to damage members of the DIOA who did not wish to become members of the DIC;

f.  By fraudulently misrepresenting and/or concealing their intention to utilize the non-golf memberships in DIC to substantially subsidize the golf operations; the truth of which did not become apparent until the DIC fees and dues were dramatically increased in December 2005;

g.  By conspiring with DIOA to impose the *ultra vires* Greenspace Assessment on the DIC in 2005, 2006, 2007, as well as in future years after the initiation of this complaint, on the membership of the DIOA for the purpose of supporting the DIC and keeping costs of golfing at the DIC artificially low; and

h.  By allowing, enforcing, and failing to control raising costs associated with the DIOA members' mandatory membership in the DIC, including food costs, dues, and initiation fees.

163.    Each of the Individual Defendants knew, should have known, or recklessly disregarded that the Individual Defendants violated and breached their duties of care, good faith, loyalty, reasonable inquiry, oversight and supervision.

164.    This conduct amounted to bad faith, wilful, wanton and grossly negligent conduct.

165.    Each of the Individual Defendants had actual or constructive knowledge that he or she had caused the Corporation to improperly represent the interests of the DIC by pursuing a frivolous and unreasonable lawsuit against ASCI and other wrongful conduct.  These actions could not have been in a good faith exercise of prudent business judgment to protect and promote the corporation's interests.

166.    As a direct and proximate result of the Individual Defendants' failure to perform their duties the DIC and the individual plaintiffs have suffered significant damages.

167.    As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Corporation and to the individual plaintiffs.

### *COUNT V:  GROSS MISMANAGEMENT*
(Against the DIC Board Defendants)

168.    Plaintiffs incorporate by reference and allege each and every allegation contained above, as though fully set forth herein.

169.    By their actions and/or inaction alleged herein, the Individual Defendants, directly, indirectly, knowingly, willfully, wantonly, grossly negligently and/or intentionally through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary obligations with regard to the prudent management of DIC in the following ways:

a. By instituting and litigating a lawsuit against ASCI which served no legitimate business objective and which effectively terminated the ASCI annual subsidy, caused the withdrawal of ASCI's substantive offer , and subjected DIC to exposure of a $3.75 million counterclaim for interference with ASCI's prospective contract with a third party;

b. By conspiring with DIOA to institute the One Island Concept and thereby force purchasers of property at Dataw Island to join the DIC;

c. By conspiring with DIOA to misrepresent the One Island Concept as an advantageous strategy to improve property values at Dataw Island, when in reality the Concept was to be used as a means to siphon funds from DIOA members to support the DIC, a separate and independent entity;

d. By entering into a contract, combination or conspiracy in restraint of trade in golf and social club memberships with DIOA, including a tying arrangement, an implied exclusive dealing arrangement and an attempt to monopolize the market for golf and social club memberships in the Dataw Island market in violation of federal and state antitrust laws, as set forth in greater particularity below;

e. By entering into an unlawful civil conspiracy with the DIOA to damage members of the DIOA who did not wish to become members of the DIC;

f. By fraudulently misrepresenting and/or concealing their intention to utilize the non-golf memberships in DIC to substantially subsidize the golf operations; the truth of which did not become apparent until the DIC fees and dues were dramatically increased in December 2005;

g.  By conspiring with DIOA to impose the *ultra vires* Greenspace Assessment on the DIC in 2005, 2006, 2007, as well as in future years after the initiation of this complaint, on the membership of the DIOA for the purpose of supporting the DIC and keeping costs of golfing at the DIC artificially low; and

h.  By allowing, enforcing, and failing to control raising costs associated with the DIOA members' mandatory membership in the DIC, including food costs, dues, and initiation fees.

170.  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, DIC and the individual plaintiffs have sustained significant damages.

171.  As a direct and proximate result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Corporation and to the individual plaintiffs.

### COUNT VI:  AIDING AND ABETTING A BREACH OF FIDUCIARY DUTIES
(Against the DIC Board Defendants)

172.  Plaintiffs incorporate by reference and allege each and every allegation contained above as though fully set forth herein.

173.  By reason of their positions as fiduciaries of DIC, the Individual Defendants owed duties of undivided loyalty, good faith, and truthful disclosure. The Individual Defendants violated and breached these duties in the following ways:

a.  By instituting and litigating a lawsuit against ASCI which served no legitimate business objective and which effectively terminated the ASCI annual subsidy, caused the withdrawal of ASCI's substantive offer , and subjected DIC to exposure of a $3.75

million counterclaim for interference with ASCI's prospective contract with a third party;

b.  By conspiring with DIOA to institute the One Island Concept and thereby force purchasers of property at Dataw Island to join the DIC;

c.  By conspiring with DIOA to misrepresent the One Island Concept as an advantageous strategy to improve property values at Dataw Island, when in reality the Concept was to be used as a means to siphon funds from DIOA members to support the DIC, a separate and independent entity;

d.  By entering into a contract, combination or conspiracy in restraint of trade in golf and social club memberships with DIOA, including a tying arrangement, an implied exclusive dealing arrangement and an attempt to monopolize the market for golf and social club memberships in the Dataw Island market in violation of federal and state antitrust laws, as set forth in greater particularity below;

e.  By entering into an unlawful civil conspiracy with the DIOA to damage members of the DIOA who did not wish to become members of the DIC;

f.  By fraudulently misrepresenting and/or concealing their intention to utilize the non-golf memberships in DIC to substantially subsidize the golf operations; the truth of which did not become apparent until the DIC fees and dues were dramatically increased in December 2005;

g.  By conspiring with DIOA to impose the *ultra vires* Greenspace Assessment on the DIC in 2005, 2006, 2007, as well as in future years after the initiation of this complaint, on

the membership of the DIOA for the purpose of supporting the DIC and keeping costs of

golfing at the DIC artificially low; and

h.  By allowing, enforcing, and failing to control raising costs associated with the DIOA

members' mandatory membership in the DIC, including food costs, dues, and initiation

fees.

174.    By virtue of their role in approving and authorization the wrongful conduct complained of

herein, the Individual Defendants were able to, and in fact did, render aid and assistance to the

other Individual Defendants in their breach of fiduciary duty. The Individual Defendants did so

knowing, or but for their gross negligence would have known, of the other Defendants' breach

of fiduciary duty.

175.    As a direct and proximate result of the Individual Defendants' aiding and abetting each

others' breach of fiduciary duty, DIC and the individual plaintiffs have sustained, and will

continue to sustain, substantial harm.

176.    The Individual Defendants are liable to DIC and to the individual plaintiffs as a result of the

acts alleged herein.

## REQUEST FOR RELIEF ON BEHALF OF
## THE INDIVIDUAL PLAINTIFFS AND DIC MEMBERS

WHEREFORE, Plaintiff, individually and derivatively on behalf of DIC and its members,

demands judgment as follows:

A.  Awarding to DIC and the individual plaintiffs money damages against all Individual

Defendants, jointly and severally, for all losses and damages suffered as a result of the

acts and transactions complained of herein, including return of illegally imposed fees

and assessments, decreased property values, delays in property sales, losses incident to the litigation against ASCI (including attorneys fees incurred and terminated subsidies and other financial benefits flowing from the ASCI relationship), and all other recoverable damages;

B.  Awarding to DIC restitution from each of the Individual Defendants and ordering disgorgement of all benefits  and/or other compensation obtained by the Individual Defendants as a result of the acts and transactions complained of herein;

C.  Rescission of the unlawful tying arrangement mandate complained of herein and the cancellation, nullification, and declaration as void of this regulation;

D.  Awarding punitive damages against the Individual Defendants;

E.  Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F.  Granting such other relief as the Court may deem just and proper; and

G.  Dissolution of the present DIC Board and selection and installation of commercial club management company to evaluate and determine the scope of future DIC operations.

## ANTITRUST ALLEGATIONS ON BEHALF OF INDIVIDUAL PLAINTIFFS AND THE ANTITRUST CLASS

### Class Allegations

177.  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves, and all others similarly situated.

178.  For purposes of all class allegations, the Class is defined as:

**All persons owning or purchasing property at Dataw Island from the inception of the One Island Concept to the present who were subjected to the mandatory membership in DIC and/or subjected to the mandatory Greenspace assessment.**

179.    The Class does not include any person named herein as an Individual Defendant.

180.    There are over 800 residential properties on Dataw Island at present with owners both past and present included in the Class making the Class so numerous that joinder of all members is impractical.

181.    There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. Such common questions include:

    a.    the definition of the relevant market;

    b.    the Defendants' market power within these markets;

    c.    whether the defendants monopolized and continue to monopolize the relevant markets;

    d.    whether the defendants attempted to monopolize and continue to attempt to monopolize the relevant markets;

    e.    whether the assessments levied were *ultra vires*;

    f.    whether the defendants created an illegal tying arrangement;

    g.    whether the defendants created an implied exclusive dealing arrangement;

    h.    whether the defendants conduct caused damage to the plaintiffs and members of the Class, diminution of property values and the increase is fees and expenses directly related to ownership on Dataw Island; and

      i.  the appropriateness of injunctive relief to restrain ongoing and future violations of the law.

182.    For the reasons described above, and further explained herein, a class action is especially appropriate in this case to promote judicial efficiency and to protect Class members' interests and rights as common questions of law and fact predominate over individual issues.

183.    Plaintiffs' claims are typical of the claims of the members of the Class and derive from a common nucleus of operative facts and because plaintiffs and all Class members were damaged by the same wrongful conduct of the defendants as alleged herein.

184.    Plaintiffs will fairly and adequately protect the interests of the Class as Class Representatives.  The interests of the Class Representatives are coincident with, and not antagonistic to, those of the other Class members and Plaintiffs have retained counsel experienced and able counsel.

185.    A class action is superior to other available methods for the fair and efficient adjudication of the issues in dispute because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford on their own to individually litigate an antitrust claim against the defendants. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

186.    Given the scope of harm inflicted by defendants and the egregiousness of their misconduct, the prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to the individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members who are not parties to the adjudication or substantially impair their ability to protect their interests.

187.    Certification of this action as a class action under Rule 23 of the Federal Rules of Civil Procedure is appropriate.

### *COUNT VII: ILLEGAL TYING ARRANGEMENT*
(Violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1
against DIOA, DIC, and the Individual Defendants)

188.    Plaintiffs repeat and re-allege on behalf of the Class each and every allegation contained in the foregoing paragraphs with the same force and effect as if here set forth in full.

189.    The DIOA requires purchasers of Dataw Island real estate to purchase a DIC membership and it requires all owners of Dataw Island real estate to pay annual assessments to supplement the operation of DIC, even if the owner does not receive any form of membership in exchange for this.  Under this tying arrangement, the tying product is Dataw Island residential property and the tied product is a membership in the DIC.

190.    The DIOA continues to impose upon purchasers of the tying product—Dataw Island residential real estate—the *ultra vires* special assessment known as the Greenspace Assessment for the illegal purpose of supporting the DIC.  This imposition of this assessment is a de facto purchase of the tied product—membership in the DIC, even though some purchasers of the tying product do not receive the benefit of membership rights in the DIC.

191.    The relevant market for antitrust purposes is residential real estate in the Dataw Island community.

192.    Because real property at Dataw Island is not subject to substitution by real estate in other areas, the DIOA possesses sufficient economic power in the Dataw Island residential real estate market to compel property owners and purchasers to buy memberships in the DIC or to contribute to the DIC even if these persons have no desire to make these purchases or contributions.

193.    The DIOA uses this market power to require any purchaser of residential real estate in the subdivision, as well as existing owners of real estate in this subdivision, to join the DIC or to contribute to the support of the DIC, even if the real estate purchaser or owner does not desire a golf or social membership with DIC.

194.    The tying arrangement has anticompetitive effects by artificially enhancing the economic viability and price competitiveness of the DIC in relation to other golf and social clubs in the area. This unlawful conduct has also harmed competition in the golf club membership market by making it economically infeasible for other competing clubs to sell memberships to residents of Dataw Island.

195.    There is no appropriate or legitimate business justification for conditioning ownership of Dataw Island real estate on the purchase of a DIC membership or for imposing the Greenspace Assessment that would counterbalance the clear anticompetitive effects of DIOA's tying conduct. To the extent that DIOA has sought to achieve any legitimate business purpose through its conduct, it has not used the least restrictive means for doing so, any claimed procompetitive benefit is outweighed by the anticompetitive harm, and any purported legitimate business justifications are mere pretexts for illegal monopoly maintenance.

196.    The unlawful conduct described herein is a direct result of a conspiracy and agreement by and between DIOA, DIC, and the Individual Defendants.

197.   This unlawful conduct has further harmed Plaintiffs and the members of the Class by

imposing a de facto mandatory premium on any Dataw Island property sold or offered for sale

and thereby adversely affecting the value of the property.

198.   This unlawful conduct has a not insubstantial impact on interstate commerce.

199.   The anticompetitive conduct described herein has caused Plaintiffs and the Class antitrust

injuries as described herein in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

### *COUNT VIII: ILLEGAL MONOPOLIZATION*
(Violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2
against DIOA, DIC, and the Individual Defendants)

200.   Plaintiffs repeat and re-allege on behalf of the Class each and every allegation contained in

the foregoing paragraphs with the same force and effect as if here set forth in full.

201.   DIOA maintains monopoly power over the terms and conditions of ownership of residential

real estate on Dataw Island.

202.   The DIOA Board Defendants have unlawfully and unreasonably exercised this monopoly

power over the relevant market, through the conduct alleged herein, to unreasonably restrain

trade and foreclose competition in club memberships on Dataw Island.

203.   By requiring all purchasers of Dataw Island real estate to purchase a DIC membership and

requiring all owners of Dataw Island real estate to pay annual assessments to supplement the

operation of DIC, even if the owner does not receive any form of membership in exchange for

this, DIOA is imposing anticompetitive conditions on ownership in Dataw Island and causing

antitrust injuries to owners and purchasers of property on the island.

204.    The relevant market for antitrust purposes is residential real estate in the Dataw Island

community.  Because real property is inherently unique and is therefore not subject to

substitution by real estate in other areas, the  DIOA possesses absolute market power and/or economic power in the Dataw Island residential real estate market.

205.    DIOA is able to use this market power to require any purchaser of residential real estate the subdivision, as well as existing owners of real estate in this subdivision, to join the DIC or to contribute to the support of the DIC, even if the real estate purchaser or owner does not desire a golf or social membership with DIC.

206.    There is no appropriate or legitimate business justification for conditioning ownership of Dataw Island real estate on the purchase of a DIC membership or for imposing the Greenspace Assessment that would counterbalance the clear anticompetitive effects of DIOA's tying conduct.  To the extent that DIOA has sought to achieve any legitimate business purpose through its conduct, it has not used the least restrictive means for doing so, any claimed procompetitive benefit is outweighed by the anticompetitive harm, and any purported legitimate business justifications are mere pretexts for illegal monopoly maintenance.

207.    The unlawful conduct described herein is a direct result of a conspiracy and agreement by and between DIOA, DIC, and the Individual Defendants

208.    This unlawful conduct has harmed competition in the golf club membership market by making it economically unfeasible for other competing clubs to sell memberships to residents of Dataw Island.

209.    This unlawful conduct has further harmed Plaintiffs and the members of the Class by imposing a de facto mandatory premium on any Dataw Island property sold or offered for sale and thereby adversely affecting the value of the property.

210.    This unlawful conduct has a not insubstantial impact on interstate commerce.

211.    The anticompetitive conduct described herein has damaged Plaintiffs and the Class and is in

violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

## COUNT IX:  UNLAWFUL EXCLUSIVE DEALING ARRANGEMENT
(Violation of Section 3 of the Clayton Antitrust Act, 15 U.S.C. § 14
against DIOA, DIC, and the Individual Defendants)

212.    Plaintiffs repeat and re-allege on behalf of the Class each and every allegation contained in

the foregoing paragraphs with the same force and effect as if here set forth in full.

213.    DIOA requires purchasers of real estate on Dataw Island to purchase DIC memberships,

effectively preventing the purchasers and owners from seeking alternative sources of supply for

such memberships.

214.    The result of this arrangement is that DIOA sells purchasers of Dataw Island real estate DIC

memberships on the implied condition, agreement, and/or understanding that the purchasers

shall deal in the club membership market exclusively with DIC.

215.    This unlawful condition, agreement, and/or understanding can be inferred from all of the

circumstances and the conduct of the parties.

216.    DIOA's arrangement unreasonably forecloses competition among suppliers in a substantial

share of the relevant club membership market, and there are no procompetitive efficiencies for

this market foreclosure that would justify such an arrangement.

217.    DIOA's conduct described herein has damaged plaintiffs and the alleged Class and is in

violation of the Clayton Antitrust Act, 15 U.S.C. § 14.

## COUNT X:  UNLAWFUL EXCLUSIVE DEALING ARRANGEMENT
(Violation of Section 39-3-140 of the South Carolina Code

against DIOA, DIC, and the Individual Defendants)

218.    Plaintiffs repeat and re-allege on behalf of the Class each and every allegation contained in

the foregoing paragraphs with the same force and effect as if here set forth in full.

219.    DIOA requires purchasers of real estate on Dataw Island to purchase DIC memberships,

effectively preventing the purchasers from seeking alternative sources of supply for such

memberships.

220.    The result of this arrangement is that DIOA sells purchasers of Dataw Island real estate DIC

club memberships on the implied agreement and/or understanding that the purchasers shall deal

in the club membership market exclusively with DIC.

221.    This unlawful agreement and/or understanding can be inferred from all of the circumstances

and the conduct of the parties.

222.    DIOA's arrangement unreasonably forecloses competition among suppliers in a substantial

share of the relevant club membership market, and there are no procompetitive efficiencies for

this market foreclosure that would justify DIOA's conspiracy to defraud.

223.    DIOA's conduct described herein has damaged plaintiffs and the alleged Class and is in

violation of § 39-3-140 of the South Carolina Code.

### *COUNT XI:  STATE LAW ANTITRUST VIOLATIONS*
(Violation of Section 39-3-10 of the South Carolina Code
against DIOA, DIC, and the Individual Defendants)

224.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing

paragraphs with the same force and effect as if here set forth in full.

225.    The anticompetitive and monopolistic practices engaged in by DIOA, as described herein,

constitutes unlawful arrangements, agreements, trusts, and/or combinations which are designed

and intended to lessen full and free competition in the relevant market.

*226.*   The anticompetitive conduct described herein has damaged and continues to damage

Plaintiffs individually and is in violation of § 39-3-10 of the South Carolina Code.

### COUNT XII: CIVIL CONSPIRACY
(Against DIOA, DIC, and the Individual Defendants)

227.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing

paragraphs with the same force and effect as if here set forth in full.

228.   Upon information and belief, the Individual Defendants (hereinafter in this cause of action

referred to as "Conspirators"), individually and as agents of DIC and DIOA unlawfully

combined, colluded, and conspired with each other to engage in actions as alleged herein for the

purpose of injuring plaintiffs and for the purpose of benefiting themselves.

229.   The Individual Defendants unlawfully combined, colluded, and conspired in the following

ways:

   a.   By conspiring and agreeing to institute the One Island Concept and thereby forcing

   purchasers of property at Dataw Island to join the DIC;

   b.   By misrepresenting the One Island Concept as an advantageous strategy to improve

   property values at Dataw Island, when in reality the Concept was to be used as a means

   to siphon funds from DIOA members to support the DIC, a separate and independent

   entity;

   c.   By entering into a contract, combination or conspiracy in restraint of trade in golf and

   social club memberships with the DIC, including a tying arrangement, an implied

   exclusive dealing arrangement and an attempt to monopolize the market for club

memberships in the Dataw Island market in violation of federal and state antitrust laws, as set forth in greater particularity below;

d.  By entering into an unlawful civil conspiracy with the DIC to damage members of the DIOA who did not wish to become members of the DIC;

e.  By imposing the *ultra vires* Greenspace Assessment on the DIOA in 2005, 2006, 2007, as well as in future years after the initiation of this complaint, on the membership of the DIOA for the purpose of supporting the DIC and keeping costs of golfing at the DIC artificially low;

f.  By allowing, enforcing, and failing to control raising costs associated with the DIOA members' mandatory membership in the DIC, including food costs, dues, and initiation fees; and

g.  By failing to timely and properly respond to proper requests for information and by hindering plaintiffs' efforts to gather information related to these actions.

230.  Upon information and belief, the Conspirators undertook these actions for the purpose of injuring plaintiffs as described above.

231.  As a result of the Conspirators' wrongful actions, Plaintiffs have been damaged in that they have suffered a loss of significant sums of money from the *ultra vires* assessments and fees, the costs associated with forced membership in DIC, and the diminished value of their property as a consequence of these actions.  Plaintiffs have also suffered special damages as a result of the Conspirators' wrongful actions, including lost opportunities to sell Dataw Island property, diminished value of their property, the expenditure of time and money in order to investigate

these matters, attorneys' fees and costs, and such other special damages as may be proven at trial.

## COUNT XIII: CONSTRUCTIVE TRUST/LEIN
(Against the DIC)

232.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if here set forth in full.

233.    The Boards of the DIC and the DIOA, in violation of state and federal law, as well as in violation of their fiduciary, common law and statutory duties, conspired illegally  to augment the membership rolls of DIC and to siphon funds from DIOA and its members in order to subsidize and supplement the operations of the DIC and the lifestyles of its golfing members.

234.    As a consequence of this improper and illegal conspiracy, DIOA collected the Greenspace Assessment from members of the DIOA and transferred those funds to the benefit of and for the operation of the DIC.

235.    By virtue of the improper and illegal conspiracy, DIC garnered, and continues to garner, substantial revenues in the form dues, dining minimums, and other payments from DIOA members who were forced to become DIC members under the terms of the One Island Concept.

236.    In equity and good conscience, the DIC and its members should not be allowed to benefit from the improper and illegal collection and distribution of the Greenspace Assessment;

237.    The DIC obtained and continues to collect funds  as a direct result of the One Island program and the Greenspace assessments.  These revenues are the direct result of fraud, bad faith, abuse of confidence, and violations of fiduciary duties, which conduct gives rise to an obligation in equity to make restitution.

238.    The DIC and its members have been unjustly enriched by their receipt of the memberships

created under the One Island program and the funds raised pursuant to the Greenspace

Assessments.

239.    By virtue of these events, the DIC has obtained money which does not equitably belong to it

and which it cannot in good conscience retain or withhold from the DIOA and its members,

which is beneficially entitled to it, because the illegal assessments and dues have been paid by

accident, mistake of fact, or fraud, or has been acquired through a breach of trust or the violation

of a fiduciary duty.

240.    Accordingly, a constructive trust in favor of the DIOA and its members should be created by

operation of law.  This constructive trust should consist of all Greenspace Assessments and all

dues, dining minimums and other payments made by people compelled to join the DIC by virtue

of their decision to purchase property at Dataw Island after the imposition of the One Island

program.

## JURY DEMAND

241.    Plaintiffs demand a trial by jury on all claims so triable.

## REQUEST FOR RELIEF ON BEHALF OF
## THE INDIVIDUAL PLAINTIFFS AND CLASS MEMBERS

WHEREFORE, Plaintiffs, individually and as representatives of the Antitrust Class, demand

judgment as follows:

A.  That the Court certify this action as a Class Action under Rule 23 of the Federal Rules of

Civil Procedure;

B.  Awarding to the individual plaintiffs and the Antitrust Class money damages against all

Individual Defendants, jointly and severally, for all losses and damages suffered as a

result of the acts and transactions complained of herein, including return of illegally imposed fees and assessments, decreased property values, delays in property sales, losses incident to the litigation against ASCI (including attorneys fees incurred and terminated subsidies and other financial benefits flowing from the ASCI relationship), and all other recoverable damages;

C.  Awarding to the individual plaintiffs and the Antitrust Class restitution from each of the Individual Defendants and ordering disgorgement of all benefits and/or other compensation obtained by the Individual Defendants as a result of the acts and transactions complained of herein;

D.  Rescission of the unlawful tying arrangement mandate complained of herein and the cancellation, nullification, and declaration as void of this regulation;

E.  Awarding punitive damages against the Individual Defendants;

F.  Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.  Granting such other relief as the Court may deem just and proper.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/ROBERT H. BRUNSON
  Robert H. Brunson
  Federal Bar No. 4971
  E-Mail: robert.brunson@nelsonmullins.com
  151 Meeting Street / Sixth Floor
  Post Office Box 1806 (29402-1806)
  Charleston, SC  29401-2239
  (843) 853-5200

Lee E. Dixon
Federal Bar No. 9490
E-Mail:  lee.dixon@nelsonmullins.com
1320 Main Street / 17th Floor
Post Office Box 11070 (29211-1070)
Columbia, SC  29201
(803) 799-2000

Attorneys for Plaintiffs

Charleston, South Carolina

October 10, 2007