# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

| | | |
|---|---|---|
| Robert C. Brandriff; Kristen E. Brandriff; Richard K. Davenport; Mary E. Davenport ("Plaintiffs"), individually and derivatively on behalf of the Dataw Island Owners' Association, Inc. ("DIOA"); and Robert C. Brandriff; Kristen E. Brandriff; Richard K. Davenport; and Mary E. Davenport, individually and as representatives of a class; | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 9:07-3361-CWH |
| vs. | ) ) ) | |
| Dataw Island Owners' Association, Inc, nominal Defendant; Dataw Island Club, Inc.; Bruce "Skip" Adams; George Beck; Victor Brinkman; Colin Collins; Earl Dietz; Merwin "Mer" Grayson; Dan Hopkins; Herb Jarvis; John Mahoney; Colin McArthur; Peter Payne; John Payne; Bob Sanderson; Lee Scher; Deirdre Smith; Bob Spengler; Phil Sutphin; Ray Hoge; Pam Weigand; Jim Smithson; Peter Post; Roger Rittinger; Gabriel Nagy; Bob Albon; Larry Bernard; Harriette Buchanan; Gary Davis; Keith Dixon; Dan Frakes; Jack Hamilton; Jerry Hubbard; Gwen Jordan; Larry Lance; Terry Lurtz; Jim Marks; Jim McCornock; Bob Pogachnick; Bob Tisch; Richard Warden; Tom Fischer; Rick Manzari; Susan Beekman; Timothy McGrath; Joe Foutch; Thomas White; Herman Schmit; D. Pierre Cameron, Jr.; and William Bush; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **ORDER** |
| Defendants. | ) ) ) | |

Page 1 of 40

Plaintiffs Robert C. Brandriff, Kristen E. Brandriff, Richard K. Davenport, and Mary E. Davenport (collectively "Plaintiffs") bring this action against Defendants Dataw Island Club ("DIC"), individual members of DIC's board of directors ("DIC Board Defendants"), and several current and former members of the board of directors of the Dataw Island Owners' Association ("DIOA Board Defendants") (collectively "Defendants"). The Plaintiffs style the action as an individual action; a shareholders' derivative action, on behalf of nominal defendant Dataw Island Owners' Association ("DIOA"); and a putative class action. The Plaintiffs base this action on their claim that the DIOA Board Defendants conspired with DIC and the DIC Board Defendants to siphon funding from the DIOA membership to bolster DIC and to restrain competition in golf and social club memberships in the market.

As the Court will discuss in more detail below, the procedural history of this case is somewhat convoluted, and there are numerous motions pending with the Court. At a hearing on January 28, 2010, the Court heard argument on several of those motions, including (1) Defendants' Motion for Partial Summary Judgment as to Class Allegations (Docket Entry #207); (2) Plaintiffs' Motion for Class Certification and for Appointment of Nelson Mullins Riley & Scarborough LLP as Class Counsel (Docket Entry #266); and (3) Plaintiffs' Motion to Exclude Certain Evidence Filed in Support of Defendants' Motion for Partial Summary Judgment as to Class Allegations (Docket Entry #268). The Court has considered these motions and rules as follows:

- Defendants' motion for partial summary judgment on the Plaintiffs' class allegations (Docket Entry #207) is DENIED as MOOT.
- Plaintiffs' motion for class certification (Docket Entry #266) is DENIED.
- Plaintiffs' motion to exclude evidence (Docket Entry #268) is DENIED.



## I. BACKGROUND AND PROCEDURAL HISTORY

A.    Dataw Island History

Dataw Island is located in Beaufort County, South Carolina and is the location of a gated club community. The Dataw Island community arose from the desire of Alcoa South Carolina, Inc. ("ASCI") to create a mixed residential development and golf club. The community provides numerous amenities – a fitness club, a swimming pool, tennis courts, and a community center. Most importantly to the instant action, two 18-hole golf courses are also located in the community.

ASCI purchased Dataw Island in 1983. It subsequently formed two non-profit corporations to manage the affairs of the island -- DIOA and DIC. DIOA was created in 1984, and serves as the property owners' association for the community. DIC was incorporated in 1987, and was intended to own and maintain the recreational and social facilities on the island, including the two golf courses.

In 1996, ASCI essentially turned over control of the island to DIOA and DIC, and at the same time filed an Amended and Restated Declaration of Covenants, Restrictions and Conditions for Dataw Island (the "Declaration"). Pursuant to this turnover, ASCI ceded the authority to select the DIOA board, which would be comprised of elected volunteers from the property owners in the community. With respect to DIC, ASCI turned over all of the recreational amenities of the community, including the golf courses, to the members of DIC. In conjunction with ASCI's transfer of control, ASCI entered into a Subsidy Agreement with DIC in which ASCI agreed to subsidize DIC for its operating losses and capital expenditures. The subsidy was capped at a certain amount annually, and the amount was calculated based on membership levels in DIC. ASCI was required



Page 3 of 40

to subsidize DIC until DIC achieved a target of 500 "A" equity members paying full dues. At the time, the parties to the agreement expressed the expectation that DIC would reach the required number of equity members by the year 2000.

B.    Amendment Three

Membership in DIC did not increase at the expected rate. The Plaintiffs allege that, in 2000, DIC began to conspire with DIOA's board in an attempt to bolster its operations. According to the Plaintiffs, one of the results of this conspiracy was a program called the "One Island Concept." The keystone to the One Island Concept was the creation and passage of an amendment to the Declaration. The amendment – referred to herein as Amendment Three -- provides, in relevant part:

> Every Person who becomes an Owner of a Lot or Dwelling after May 31, 2001 shall thereupon be required to be and shall automatically become at least a Social Member of the Dataw Island Club, Inc. ("Club") for so long as such Person continues to be an Owner of such Lot or Dwelling, with all of the rights, privileges and obligations of Social Membership as from time to time set forth in the By-Laws of the Club. The applicable Social Membership Initiation Fee shall be payable by such Owner at the closing of the conveyance to the Owner of the Lot or Dwelling, and such payment shall be a condition precedent to delivery of a deed or other form of conveyance.
>
> . . .
>
> The provisions of this Section 4.02 shall run with the title of and be appurtenant to all Lots and Dwellings transferred or otherwise conveyed after May 31, 2001, and shall be binding upon and inure to the benefit of all Owners of such Lots and Dwellings and their respective heirs, executors, legal representatives, successors and assigns. Each Owner, by acceptance of a deed or other conveyance of a Lot or Dwelling after May 31, 2001, consents and agrees to the obligation of automatically being at least a Social Member of the Club.



Docket Entry #266-18.[1] Essentially, Amendment Three requires that all purchasers of property on Dataw Island after May 31, 2001, become members of DIC.[2] The Plaintiffs allege that, prior to the adoption of Amendment Three, property owners on Dataw Island were not required to become members of DIC. Docket Entry #45 at ¶ 86. The Plaintiffs also allege that prior to the amendment DIC provided only two classes of equity membership – A Class Golf and B Class Social. Id. After the adoption of Amendment Three, DIC created a third class of non-equity membership, which became the new Social membership, and the B Class Social membership was renamed as Sport. Id. DIC originally set the Social member initiation fee at $4,000, but eventually increased that fee to $15,000 in December of 2005. Id. at ¶ 91.

At a meeting on February 20, 2001, DIOA's membership approved Amendment Three by a margin greater than the required 75%. Id. at ¶ 86. According to the Plaintiffs, the Defendants procured the DIOA membership's approval by representing to the membership that Amendment Three would result in increased property values on the Island. Id. at ¶ 84. The Plaintiffs allege that this has not happened, and that Amendment Three simply serves as a vehicle for transferring funds from DIOA's membership to DIC in order to cover the costs of maintaining the golf courses at below market prices for golfing members of DIC. Id. at ¶ 90. The Plaintiffs claim that Amendment Three actually harms property values on the Island by imposing a de facto premium on any Dataw Island property sold or offered for sale.

---

[1] While the Plaintiffs have designated the text of Amendment Three as "confidential" in their motion for class certification, the Court notes that the text of the Amendment has been cited multiple times in filings with the Court. See, e.g., Docket Entry #176 at 6; Docket Entry #189 at 3.

[2] Property owners who purchased their property prior to May 31, 2001 are not required to join DIC.



C.    Greenspace Fee

The other proposal at issue in this case is the "Greenspace Fee." Since 2005, the DIOA's annual budget has included an increase in the annual assessment paid by all DIOA members, regardless of whether those members are also members of DIC. The Plaintiffs allege that the funds raised by the Greenspace Fee have been transferred in full to the DIC to subsidize golfing operations and to reduce dues for golfing members of DIC. Id. at ¶ 101. While the DIOA budgets including the Greenspace Fee have been voted on, and approved, by the DIOA membership each year of the Greenspace Fee's existence, the Plaintiffs claim that such approval is due to misrepresentations made by the Defendants to the DIOA membership. Id. at ¶ 100.

D.    The Plaintiffs

Plaintiffs Robert C. Brandriff and Kristen E. Brandriff ("the Brandriffs") are citizens and residents of the state of Connecticut who purchased a home on Dataw Island on April 1, 2001. Id. at ¶ 11. The Brandriffs are members of DIOA but not DIC.

Plaintiffs Richard K. Davenport and Mary E. Davenport ("the Davenports") purchased a home on Dataw Island on January 10, 2003. Id. at ¶ 12. The Davenports are also members of DIOA, and, because the Davenports purchased their property on Dataw Island after May 31, 2001, Amendment Three required that they join DIC.

E.    Procedural History

The original complaint in this action was filed on October 10, 2007, and the Plaintiffs filed an amended complaint on November 20, 2007. Docket Entry #1; Docket Entry #7. In April of 2008, the Plaintiffs, with the consent of the Defendants, filed a second amended complaint ("Second



Amended Complaint"). Docket Entry #45. In total, the Second Amended Complaint raises no fewer than seventeen separate causes of action.

First, Counts I through IV are derivative claims on behalf of the DIOA for breaches of fiduciary duty (count I), gross mismanagement (count II), aiding and abetting breaches of fiduciary duty (count III), and unlawful distribution (count IV). Essentially, the Second Amended Complaint alleges that the DIOA Board Defendants violated their duties to the DIOA by conspiring with DIC and the DIC Board Defendants to impose Amendment Three and the Greenspace Fee on the DIOA membership. Counts I, II, and III rest on Plaintiffs' claims that the DIOA Board Defendants committed the following violations of their duties to the DIOA membership:

a.   By instituting the One Island Concept and thereby forcing purchasers of property at Dataw Island to purchase a membership in and join DIC;

b.   By misrepresenting the One Island Concept as an advantageous strategy to improve property values at Dataw Island, when in reality the Concept was to be used as a means to siphon funds from DIOA members to support the DIC, a separate and independent entity;

c.   By entering into a contract, combination, or conspiracy in restraint of trade in golf and social club memberships with the DIC, including a tying arrangement, an implied exclusive dealing arrangement, and an attempt to monopolize the market for golf and social club memberships in the Dataw Island market in violation of federal and state antitrust laws, as set forth in greater particularity below;

d.   By entering into an unlawful civil conspiracy with the DIC to damage members of the DIOA who did not wish to become members of the DIC;

e.   By imposing the ultra vires Greenspace Assessment in 2005, 2006, 2007, as well as in future years after the initiation of this complaint, on the membership of the DIOA for the purpose of supporting the DIC and keeping costs of golfing at the DIC artificially low;

f.   By fraudulently misrepresenting and/or concealing their intention to utilize the non-golf memberships in DIC to substantially subsidize the golf



operations, the truth of which did not become apparent until the DIC fees and dues were dramatically increased in December 2005;

g.    By allowing, enforcing, and failing to control raising costs associated with the DIOA members' mandatory membership in the DIC, including food costs, dues, and initiation fees;

h.    By proposing, adopting, and implementing additions to the DIOA Covenants and Restrictions pursuant to the One Island Concept that were not authorized or allowed by the Covenants and Restrictions and that do not touch and concern the land and, consequently, do not run with the land, making them ultra vires, null and void, and unenforceable;

i.    By instituting a lawsuit against ASCI which, upon information and belief, was instituted solely or primarily for the benefit of DIC and, as a result of this lawsuit and attendant breaches of fiduciary duties, DIOA funds were improperly utilized to fund litigation between DIC and ASCI;

j.    By authorizing expenditures that were intended primarily to benefit DIC at the expense of DIOA and its membership and/or authorizing expenditures that are otherwise ultra vires, which expenditures include, but are not necessarily limited to, marketing expenditures, the purchase of expensive equipment for sole benefit of DIC, and, on information and belief, other contracts and agreements with consultants, agents, vendors, and third parties, which incurred expenses are ultra vires in that they are not authorized by DIOA's By-Laws, Restated Covenants, or Articles of Incorporation.

k.    By failing to timely and properly respond to proper requests for information and by hindering Plaintiffs' efforts to gather information related to these actions.

Id. at ¶¶ 131, 138 and 142. The Plaintiffs support Count IV – the unlawful distribution count – with allegations that the Greenspace Fee represents an unlawful payment of DIOA funds to the direct benefit of those DIOA Board members who were also DIC equity membership holders. Id. at ¶ 149.

Counts IX through XVII of the Second Amended Complaint are putative class claims against DIC, and at times the DIOA and DIC Board Defendants (the "Individual Defendants"). More specifically, Counts IX through XIII are state and federal antitrust claims, raised against both DIC



and the Individual Defendants. Count XIV alleges that DIC and the DIC Board Defendants violated the South Carolina Unfair Trade Practices Act, Count XV alleges civil conspiracy against DIC and the Individual Defendants, Count XVI brings a claim for unjust enrichment against DIC, and Count XVII raises a tortious interference with contract claim against DIC and the Individual Defendants.

Finally, the Second Amended Complaint seeks declaratory judgments that Amendment Three and the Greenspace Fee are invalid (counts V and VII) and injunctions prohibiting their enforcement (counts VI and VIII). Specifically, the Plaintiffs allege that Amendment Three was imposed on the DIOA membership despite the fact that the Declaration did not permit such an amendment and that, even if the Declaration did permit such an amendment, Amendment Three is a personal covenant that does not run with the land. Similarly, the Plaintiffs claim that neither the Declaration, nor the DIOA's by-laws, permitted the imposition of the Greenspace Fee and that the Greenspace Fee is unenforceable under South Carolina law.

On March 2, 2009, the Plaintiffs made a motion to file a third amended complaint. The proposed third amended complaint added certain factual allegations allegedly revealed during discovery, altered the proposed class definition, dismissed certain individual defendants, and deleted the Plaintiffs' claims for gross mismanagement, unlawful exclusive dealing, and civil conspiracy. Docket Entry #163. The proposed third amended complaint also added four additional causes of action against the Defendants, claiming that the Defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO) in obtaining the passage of Amendment Three and the



Greenspace Fee.[3] On June 16, 2009, after hearing argument, this Court denied the Plaintiffs' motion to file a third amended complaint. Docket Entry #315.

On September 25, 2009, the Plaintiffs again moved to amend their complaint, filing a "Renewed Motion to Amend Complaint Based on Changed Circumstances," and submitting a new version of their proposed third amended complaint. This new version of the proposed third amended complaint was similar, but not identical, to the version of the proposed third amended complaint that the Court rejected during the hearing of June 16, 2009. Specifically, it added a RICO claim as to some defendants; clarified and added facts allegedly uncovered during discovery; added a breach of covenant count against the DIOA Board Defendants and DIC; added a conflict-of-interest transactions count against the DIOA Board Defendants; added an aiding-and-abetting a breach of duty count against the DIC Defendants; removed Plaintiffs' claims for unlawful exclusive dealing, violations of the South Carolina Unfair Trade Practices Act, civil conspiracy, gross mismanagement, and the aiding-and-abetting a breach of duty claim against the DIOA Defendants; refined the definition of the class; refined Plaintiffs' antitrust claims; and expanded the group of causes of action alleged as claims on behalf of the proposed class to include every cause of action alleged in the proposed third amended complaint, including those causes of action that originally had been pleaded only as derivative claims. Docket Entry #360. This Court denied the Plaintiffs' renewed motion to

---

[3] Before the Court heard argument on this motion, the Plaintiffs filed a new motion in which they sought leave to file a revised version of their proposed third amended complaint. Docket Entry #201. In this motion, the Plaintiffs acknowledged that statute of limitations concerns existed with respect to RICO allegations relating to the passage of Amendment Three, and removed those allegations from the proposed third amended complaint. The revised third amended complaint also removed references to ASCI that the Defendants contended necessitated that ASCI be joined as an indispensable party to this action. The revised version of the proposed third amended complaint, however, still contained allegations that the defendants violated RICO in obtaining approval of the Greenspace Fee. Docket Entry #201-1.



amend by oral order during the class certification hearing on January 28, 2010. Accordingly, the Second Amended Complaint remains the operative complaint in this action.

In addition to the several motions to amend discussed above, the parties in this case have filed cross-motions on the issue of class certification, as well as numerous dispositive motions. First, on March 13, 2009, the Plaintiffs moved for partial summary judgment on their claims for a declaratory judgment and injunction with respect to Amendment Three. Docket Entry #176. At the beginning of May 2009 – nearly nineteen months after the Plaintiffs filed their original complaint – the Plaintiffs still had not moved for certification of their proposed class, and on May 14, 2009 the Defendants filed a motion for partial summary judgment as to the Plaintiffs' class allegations. Docket Entry #207. Over the next two days, on May 15 and 16, the Defendants also filed several dispositive motions. Docket Entry ## 209 to 237. Thereafter, on June 1, 2009, the Plaintiffs filed their motion to certify the class, Docket Entry #266, as well as a motion to strike evidence that the Defendants cited in support of their own motion for partial summary judgment on the Plaintiffs' class allegations, Docket Entry #268.

On June 16, 2009, the Court heard argument on the Plaintiffs' motion for partial summary judgment on the issue of whether Amendment Three is enforceable. At that hearing, the Court denied Plaintiffs' motion by oral order. Docket Entry #315. The Court held another hearing on July 9, 2009. At this hearing, the Court noted that it had reconsidered whether the validity and enforceability of Amendment Three was an issue appropriate for summary judgment and continued the case to provide the parties an opportunity to file motions addressing that issue and the validity of the Greenspace Fee. Docket Entry #331. On July 14, 2009, the Plaintiffs filed a motion for partial summary judgment as to the validity of the Greenspace Fee, Docket Entry #332, and the parties filed



supplemental briefing on the validity of Amendment Three, Docket Entry ## 333, 334, 342 and 344. The following motions are currently pending with the Court: Defendants' Motion for Partial Summary Judgment as to Class Allegations (Docket Entry #207); the DIOA Board Defendants' Motion for Summary Judgment (Docket Entry #209); the DIOA Board Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment (Docket Entry #210); the DIC and DIC Board Defendants' Motion for Summary Judgment (Docket Entry #211); separate motions for summary judgment by several of the DIC Board Defendants (Docket Entry ##212 to 237); Plaintiffs' Motion for Class Certification and for Appointment of Nelson Mullins Riley & Scarborough LLP as Class Counsel (Docket Entry #266); Plaintiffs' Motion to Strike Certain Evidence Filed in Support of Defendants' Motion for Partial Summary Judgment as to Class Allegations (Docket Entry #268); Plaintiffs' Motion for Leave to File Surreply in Opposition to the DIOA Board Defendants' Motion for Summary Judgment (Docket Entry #317); Plaintiffs' Motion for Leave to File Further Opposition to the DIC and DIC Board Defendants' Motions for Summary Judgment (Docket Entry #326); Plaintiffs' Motion for Partial Summary Judgment as to Validity of Greenspace Assessment (Docket Entry #332); and the DIC Defendants' Motion for Leave to File Sur-Reply Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment as to Validity of Greenspace Assessment (Docket Entry #356). The Court also notes that Plaintiffs' Motion for Partial Summary Judgment (Docket Entry #176), while originally denied, was renewed at the July 6, 2009 hearing and is thus also pending.

## II. CLASS CERTIFICATION

The Court now addresses whether it should certify the Plaintiffs' proposed class. Three of the outstanding motions in this case relate to that issue: (1) Defendants' Motion for Partial Summary



Judgment as to Class Allegations (Docket Entry #207); (2) Plaintiffs' Motion to Certify Class (Docket Entry #266); and (3) Plaintiffs' Motion to Strike Certain Evidence Filed in Support of Defendants' Motion for Partial Summary Judgment as to Class Allegations (Docket Entry #268). Because Docket Entry ##207 and 266 are essentially cross-motions on the same issue – whether Plaintiffs have satisfied Rule 23's requirements for class certification – the Court will address these together. As a preliminary matter, however, the Court will address Plaintiffs' motion to strike.

A.    Plaintiffs' Motion to Strike – Docket Entry #268

As the Court will discuss in more detail below, the Defendants in this case argue that class certification is not appropriate in this case because, among other reasons, the Plaintiffs cannot satisfy Fed. R. Civ. P. 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class." Specifically, the Defendants argue that there is significant opposition within the Dataw Island community to the Plaintiffs' suit and that this opposition renders the Plaintiffs inadequate representatives of the proposed class. In their filings with the Court, the Defendants have supported this argument with pieces of evidence to which the Plaintiffs object: (1) the deposition testimony of four absent members of the putative class – Myron Elkins, Betty Elkins, Harry Vanderbank, and Margaret Cramer – in which those individuals indicate a desire not to be a part of the Plaintiffs' proposed class and (2) a petition purportedly signed by approximately 800



residents of Dataw Island stating their opposition to becoming parties to this suit.[4] The Plaintiffs

have moved to strike this evidence from the record.

The Court denies the Plaintiffs' motion to strike. First, the majority of the Plaintiffs' motion

is devoted to attacking the weight the Court should give the disputed evidence, not its admissibility.

To the extent that the Plaintiffs mount an attack on the admissibility of the Defendants' proffered

deposition testimony, they do so by pointing the Court to cases that address the threshold for

allowing defendants to depose absent class members. See In re FedEx Ground Package Sys., No.

3:05-MD-527, 2007 U.S. Dist. LEXIS 16205 at *20-22 (N.D. Ind. 2007). Here, the depositions have

already occurred, and the Plaintiffs point to no authority that would foreclose their use in this case.

With respect to the Plaintiffs' suggestion that consideration of the Defendants' proffered petition is

barred by the hearsay rule, the Court notes that, in making a decision on class certification, it can

consider evidence that would be inadmissible at trial.[5] See, e.g., Mazza v. Am. Honda Motor Co.,

254 F.R.D. 610, 616 (C.D. Cal. 2008) ("On a motion for class certification, the court may consider

---

[4] Three days prior to the scheduled hearing on the class certification issues, Plaintiffs' counsel disclosed that he had received several hundred letters from Dataw Island residents expressing opposition to the Plaintiffs' suit. The Plaintiffs suggest that the Court should exclude these letters from its consideration for the same reasons it should exclude the disputed petition. Docket Entry #383. The Court's ultimate treatment of the petition – that it is admissible, but does not provide evidence sufficient to preclude certification – applies equally to the letters.

[5] The Plaintiffs also claimed that the petition should be excluded because its admission would violate the well established rule "that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993). As the Defendants point out, however, their motion, while styled a "Motion for Partial Summary Judgment as to Class Allegations," really is a motion attacking Plaintiffs' ability to meet Rule 23's requirements. "Unlike evidence presented at the summary judgment stage, evidence presented in support of class certification need not be admissible at trial." Heffelfinger v. Elec. Data Sys. Corp., No. 07-00101, 2008 U.S. Dist. LEXIS 5296 at *7 n.18 (C.D. Cal. 2008) (collecting cases).

evidence that may not be admissible at trial." (citing <u>Eisen v. Carlisle & Jacqueline</u>, 417 U.S. 156, 178 (1974))); <u>Fisher v. Ciba Specialty Chems. Corp.</u>, 238 F.R.D. 273, 279 (S.D. Ala. 2006) ("Courts confronted with Rule 23 issues may consider evidence that may not ultimately be admissible at trial."). <u>Accord</u> <u>Paxton v. Union Nat'l Bank</u>, 688 F.2d 552, 562 n.14 (8th Cir. 1982) ("Hearsay testimony may be admitted to demonstrate typicality."). Moreover, other courts appear to have considered petitions expressing disapproval with a case as evidence of the inadequacy of the putative class representative. <u>See</u> <u>Pratt v. Chicago Housing Authority</u>, 155 F.R.D. 177 (N.D. Ill. 1994). The Court thus will not strike this evidence from the record.[6] The Plaintiffs' motion to exclude evidence (Docket Entry #268) is DENIED.

B.    <u>Plaintiffs' Motion to Certify the Class – Docket Entry #266</u>

On June 1, 2009, the Plaintiffs filed a motion to certify a class with respect to several of their claims. Specifically, the Plaintiffs moved to certify the following claims: (1) the request for a judgment declaring Amendment Three invalid and enjoining its enforcement (Counts V and VI); (2) the request for a judgment declaring the Greenspace Charge invalid and enjoining its enforcement (Counts VII and VIII); (3) an antitrust claim under § 1 of the Sherman Act, alleging that Amendment Three constitutes an illegal tying arrangement (Count IX); a monopolization antitrust claim under § 2 of the Sherman Act (Count X); and state law antitrust claims under S.C. Code § 39-3-10 (Count

---

[6] As discussed more fully below, the Court's decision to deny class certification rests not on the Defendants' claim that opposition to the suit from within the class renders the Plaintiffs inadequate representatives, but on the Court's determination that there are actual conflicts between members of the proposed class. Thus, while the Court finds the contested evidence admissible, it does not rely on this evidence in reaching its ultimate decision.



XIII).[7] The Plaintiffs seek to certify the following class: "All persons owning or purchasing property at Dataw Island from May 31, 2001 through the date of judgment." Docket Entry #266.

"To be certified, a proposed class must satisfy Rule 23(a) and one of the three sub-parts of Rule 23(b)." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 318 (4th Cir. 2006) (citation omitted). "The requirements of Rule 23(a) are familiar: numerosity of parties, commonality of factual or legal issues, typicality of claims and defenses of class representatives, and adequacy of representation." Id. In addition, the Plaintiffs here seek certification under Rule 23(b)(3), which imposes two requirements: "that questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "At this stage, the class representative need not establish its case on the merits. Nevertheless, some preliminary inquiry into the merits may be necessary for an intelligent determination of whether to

---

[7] The Plaintiffs also moved to certify the RICO claims that Plaintiffs included in their various proposed third amended complaints. The Court does not address whether those claims are appropriate for class certification because the Court has denied Plaintiffs' motions to amend.

Additionally, at the hearing on the Plaintiffs' motion for class certification, the Plaintiffs claimed that they actually seek to certify all of their claims as class claims. Yet, the Plaintiffs never submitted any pleading to the Court in which they specifically move for certification of a class with respect to claims other than those addressed in their original motion. When questioned on this by the Court, Plaintiffs' counsel could point only to a single line in the Plaintiffs' motion for leave to submit a proposed trial plan. The Plaintiffs asserted that their proposed trial plan was submitted "in support of their motion for class certification." (Docket Entry #361). At no point does the proposed trial plan address Rule 23, its requirements, or how those requirements apply to causes of action other than those raised in Plaintiffs' motion for class certification. While Plaintiffs' counsel did proceed to address Rule 23's applicability to these other claims during the hearing, the Court does not believe that the issue of certification of claims other than those raised in Plaintiffs' motion for class certification is properly before it. Moreover, a proper motion seeking to certify those claims would fail for the same reasons the current motion fails – the proposed class is riddled with actual and potential conflicts.



certify the class." <u>Parks Auto. Group, Inc. v. GMC</u>, 237 F.R.D. 567, 570 (D.S.C. 2006) (internal

citations omitted). The Plaintiffs bear the burden of demonstrating that Rule 23's requirements are

satisfied. This Court has broad discretion in determining whether certification of the Plaintiffs'

proposed class is appropriate. <u>See</u> <u>Gariety v. Grant Thornton, LLP</u>, 368 F.3d 356, 370 (4th Cir.

2004) ("[P]laintiffs bear the burden . . . of demonstrating satisfaction of the Rule 23 requirements

and the district court is required to make findings on whether the plaintiffs carried their burden.");

<u>Lienhart v. Dryvit Sys., Inc.</u>, 255 F.3d 138, 146 (4th Cir. 2001) ("A district court has broad discretion

in deciding whether to certify a class." (internal quotation marks omitted)). The Court now

addresses whether the Plaintiffs have met their burden with respect to Rule 23's requirements.

       1.    Numerosity

Numerosity exists when the proposed class "is so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). "Practicability of joinder depends on the size of the class,

ease of identifying its numbers and determining their addresses, facility of making service on them

if joined in the action and their geographic dispersion." <u>Lott v. Westinghouse Savannah River Co.</u>,

200 F.R.D. 539, 550 (D.S.C. 2000) (citing <u>Kilgo v. Bowman Transp., Inc.</u>, 789 F.2d 859, 878 (11th

Cir. 1986)). Ultimately, though, "[t]here is no mechanical test for determining whether in a

particular case the requirement of numerosity has been satisfied." <u>Kelley v. Norfolk & W. Ry. Co.</u>,

584 F.2d 34, 35 (4th Cir. 1978). "The issue is primarily for the District Court, to be resolved in light

of the facts and circumstances of the particular case." <u>Id.</u>

The Plaintiffs' proposed class satisfies the numerosity requirement. The Plaintiffs claim –

and the Defendants do not appear to contest – that the proposed class could contain as many as 1,500

current and former property owners on Dataw Island. The Defendants argue, however, that



numerosity does not exist because "the identities of all of the Putative Class Members can easily be determined" and "the class is defined to include only a group of people who are, or were, quite literally neighbors of one another." Docket Entry #207-1 at 12. The Defendants contend:

> The Putative Class members are all present or past owners of Dataw Island properties, whose identities and contact information will be available at the County Register of Deeds Office, as part of the public record. As to the present owners, Plaintiffs obviously know where those Putative Class Members can be reached on Dataw Island. A great percentage of the Putative Class Members will be physically located on Dataw Island, for at least part of the year. There is nothing that would prohibit all of the Putative Class Members from being identified and added to this case.

Id. at 12-13.

While the Court acknowledges that it might very well be possible to identify and join in this action all members of the proposed class, such a theoretical possibility will not, on its own, foreclose a finding that the numerosity requirement has been satisfied. Smith v. B&O R. Co., 473 F. Supp. 572, 581 (D. Md. 1979). Plaintiffs "only need to show that it is extremely difficult or inconvenient to join all the members of the class." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1762 (3d ed. 2005). As the proposed class contains up to 1,500 members, difficulty and inconvenience would attend the joinder of all members of the Plaintiffs' proposed class: numerosity exists. Cf. Trull v. Dayco Prods., LLC, 214 F.R.D. 394, 397-98 (W.D.N.C. 2003) (certifying a class of 800 retirees and noting that the joinder of such a high number of potential class members was impracticable); Bates v. Tenco Servs., Inc., 132 F.R.D. 160, 162-63 (D.S.C. 1990) ("Despite defendants' arguments that some class members are indifferent to the suit, or that the class resides within a limited geographical area, . . . a lawsuit with potentially one hundred



and eighty plaintiffs presents logistical problems that make the practicality of permissive joinder dubious.").

      2.     Commonality

"Commonality requires that there are questions of law or fact common to the class." Lienhart, 255 F.3d at 146 (internal quotation marks omitted). "A common question is one that can be resolved for each class member in a single hearing." Thorn, 445 F.3d at 319. "A question is not common, by contrast, if its resolution turns on a consideration of the individual circumstances of each class member." Id. (internal quotation marks and citation omitted). Here, the Court finds that all of Plaintiffs' proposed class claims satisfy the commonality requirement.

To begin, Plaintiffs' claims for declaratory and injunctive relief with respect to Amendment Three and the Greenspace Fee present common questions. The Plaintiffs challenge Amendment Three on the basis that (1) enactment of Amendment Three exceeded the scope of the DIOA's authority to amend the Declaration and (2) if valid, Amendment Three is a personal, not a real, covenant and thus can only be enforced against the covenanting parties. These two issues – whether Amendment Three was validly enacted and whether it is a personal or real covenant – are legal issues that can be resolved on a classwide basis. Similarly, the Plaintiffs challenge the Greenspace Fee on the basis that the DIOA lacked authority under the Declaration to impose the Greenspace Fee on its membership. As with the Plaintiffs' claims with respect to Amendment Three, this is a legal issue that can be resolved on a class wide basis.

The Plaintiffs also seek to certify antitrust claims. "To establish an antitrust violation, a plaintiff would have to prove (1) a violation of the antitrust law, (2) direct injury to the plaintiff from such violations, and (3) damages sustained by the plaintiff." Deiter v. Microsoft Corp., 436 F.3d



461, 467 (4th Cir. 2006) (internal quotation marks and citations omitted). The Plaintiffs here seek to prove a violation of federal antitrust law under two separate theories – a tying claim under § 1 of the Sherman Act and a monopolization claim under § 2 of the Sherman Act – as well as state antitrust violations.[8]

First, Plaintiffs claim that DIC and the Individual Defendants have violated § 1 of the Sherman Act, 15 U.S.C. § 1, by instituting an illegal tying arrangement. "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 461 (1992) (internal quotation marks and citations omitted). A plaintiff asserting a per se tying claim under § 1 must prove the following four elements: "(1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce." Service & Training, Inc. v. Data General Corp., 963 F.2d 680, 683 (4th Cir. 1992) (footnotes omitted). The Plaintiffs argue that all four elements of their tying claim present issues common to the class.

---

[8] South Carolina adheres to a policy of following federal precedents in matters relating to state trade regulation enforcement. See Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc., 672 F. Supp. 1489, 1521 (D.S.C. 1987). Plaintiffs' state law antitrust claims will rise or fall with their federal antitrust claims. See Welchlin v. Tenet Healthcare Corp., 366 F. Supp. 2d 338, 342 n.5 (D.S.C. 2005) ("As Defendants point out, the court's finding with respect to liability on Plaintiff's federal antitrust claims will be dispositive of the state law antitrust claim."). Thus, the Court will not specifically address Plaintiffs' state law claims.



The Plaintiffs argue that the first two elements of a tying claim – the existence of two separate products and an agreement conditioning purchase of the tying product (Dataw Island real estate) upon purchase of the tied product (DIC memberships) – will be satisfied through the use of common proof. Specifically, the Plaintiffs point to Amendment Three and argue that "Plaintiffs may readily establish the existence of a 'tie' between the two products through documentary evidence, which is applicable class wide." Docket Entry #266-1 at 28. The Court agrees with the Plaintiffs on this point, and the Defendants do not appear to disagree. Defendants similarly do not appear to question that the final requirement of a tying claim – a not insubstantial impact on interstate commerce – is susceptible to common proof.

The third element of a tying claim is the requirement that a seller possess sufficient economic power in the tying product market to restrain competition in the tied product market. The Plaintiffs here allege that the relevant tying product market is Dataw Island Real Estate/DIOA Memberships, and that they will demonstrate the existence of market power through the use of the "locked-in aftermarket market theory" that the Supreme Court recognized in the case of <u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>, 504 U.S. 451 (1992). The basic thrust of the Plaintiffs' argument is that individuals who purchased property on Dataw Island became "locked-in" to the market, at which time the DIC, by conspiring with the DIOA, was able to conduct the activities that the Plaintiffs assert constitute antitrust violations. The Plaintiffs argue that a critical element in a "lock-in" claim is an unexpected change of policy after customers are "locked-in" to a product. See <u>PSI Repair Servs. v. Honeywell, Inc.</u>, 104 F.3d 811, 820 (6th Cir. 1997). According to the Plaintiffs: "When a defendant changes its policies concerning a certain product, and the purchasers had no way



Page 21 of 40

of anticipating the change in policies at the time they purchased the product, then the purchasers have been locked-in to the aftermarket by the change in policy." (D.E. #266-1, p. 29).

The Plaintiffs argue that the "lock-in" theory applies to their case in two ways. First, the Plaintiffs argue that individuals who purchased their properties on Dataw Island prior to May 31, 2001 – the "Pre-One Island Plaintiffs" – were locked in to Dataw Island and could not have anticipated the passage of Amendment Three and the resulting requirement that they sell their properties only to purchasers willing to pay for membership in DIC. (D.E. #360-1, p. 58-59). Second, the Plaintiffs argue that those who purchased property on Dataw Island between May 31, 2001 and December 19, 2005 were locked in to Dataw Island and could not have anticipated the imposition of the Greenspace Fee and increase in the initial DIC contribution from $4,000 to $15,000. Id.

According to the Plaintiffs, their theory of market power also presents a common issue that is suitable for decision on a classwide basis. The Defendants contest this point, arguing that "[u]nder a 'lock-in' theory, the expectations and knowledge of each individual Putative Class Member must be carefully scrutinized and proven." Docket Entry #312 at 17. Because the Court would have to analyze the applicability of the "lock-in" theory to each particular class member, the Defendants claim that whether the Plaintiffs can use the "lock-in" theory to establish market power in this case is not a common issue susceptible of classwide resolution.

The Court finds that the applicability of Plaintiffs' "lock-in" theory of market power is an additional common issue in this case. Despite the Defendants' claim that the "lock-in" theory necessitates an inquiry into each class member's subjective state of mind, the case Defendants cite for support suggests the opposite. In SubSolutions, Inc. v. Doctor's Assocs., 436 F. Supp. 2d 348



(D. Conn. 2006), the court did not focus on each individual plaintiff's expectations, but on what a "reasonable" purchaser of the tying product would have expected. SubSolutions, Inc., 436 F. Supp. 2d at 355. This is an objective standard that the Court believes could be resolved on a classwide basis. Accordingly, the Court finds that Plaintiffs' "lock-in" theory of market power presents an additional common issue in this case.[9]

With respect to Plaintiffs' monopolization claim, the Court also finds common issues of fact or law. "[T]o prove a violation of § 2 of the Sherman Act . . . a plaintiff would have to demonstrate that the defendant possesses monopoly power in the relevant market and willfully acquired or maintained that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Deiter, 436 F.3d at 467 (internal quotation marks and citations omitted). The plaintiff also must "prove that antitrust injury . . . resulted from the illegal acquisition or maintenance of monopoly power." Id. Plaintiffs' monopolization claim in this case presents issues similar to the tying claim discussed above because the monopolization claim also depends on a "lock-in" theory of market power. The Court finds that the Plaintiffs have met their burden of demonstrating commonality with respect to this claim.

To conclude, the Court points out that Rule 23(a)'s commonality requirement presents a "relatively light burden" for plaintiffs seeking certification of a class. Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1268 (11th Cir. 2009). Indeed, the parties' arguments in this case are more directed at discussing whether or not the Plaintiffs have met Rule 23(b)(3)'s much more rigorous burden of

---

[9] The Court does note that it appears that the Plaintiffs bring two separate tying claims on behalf of two different classes of purchasers of property on Dataw Island – the "Pre-One Island" and "Post-One Island" plaintiffs. The Court does not believe that this characteristic of the Plaintiffs' case prevents a finding of commonality because the elements of the Plaintiffs' tying claims would be common with respect to each of those different classes.



showing that the common questions in the case predominate over individual issues. See, e.g., Docket Entry #207-1 at 14; Docket Entry #267 at 5; Docket Entry #312 at 15-16. Since the Court believes that the proposed class claims discussed above all present common questions that could be resolved on a classwide basis, the Court finds that the Plaintiffs have satisfied Rule 23(a)'s commonality requirement.

      3.    Adequacy

Rule 23(a) imposes the requirement that "the representative parties will fairly and adequately protect the interests of the class." "The principal factor in determining the adequacy of class representatives is whether the plaintiffs have the ability and commitment to prosecute the action vigorously." S.C. Nat'l Bank v. Stone, 139 F.R.D. 325, 329 (D.S.C. 1991). The adequacy inquiry involves consideration of two issues: "(i) 'whether plaintiffs have any interest antagonistic to the rest of the class;' and (ii) whether plaintiffs' counsel are 'qualified, experienced and generally able to conduct the proposed litigation.'"[10] Id. at 330 (quoting Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 726 (11th Cir. 1987). Here, the Court finds that conflicts of interest -- both actual and potential -- exist within the proposed class that prevent the Plaintiffs from satisfying Rule 23(a)'s adequacy requirement.

i.

Before addressing those conflicts, though, the Court first will discuss Defendants' primary argument against the adequacy of Plaintiffs' representation – that a significant number of Dataw

---

[10] "The adequacy of plaintiffs' counsel . . . is presumed in the absence of specific proof to the contrary." S.C. Nat'l Bank v. Stone, 139 F.R.D. 325, 330-31 (D.S.C. 1991). In this case, the Defendants do not argue that Plaintiffs' counsel is inadequate.



Island residents disapprove of, and actively oppose, Plaintiffs' lawsuit. The Defendants point to the following as evidencing class members' opposition to the Plaintiffs' suit: (1) the deposition testimony of Myron Elkins, Betty Elkins, Harry Vanderbank, and Margaret Cramer; (2) the passage of Amendment Three; (3) the DIOA membership's annual approval of the Greenspace Fee; and (4) a petition purportedly signed by approximately 800 residents of Dataw Island stating their opposition to becoming parties to this suit. As noted above, the parties also presented to the Court evidence of an ongoing letter writing campaign by current residents of Dataw Island. Plaintiffs' counsel has represented to the Court that he has received 792 letters, representing 417 households on Dataw Island, expressing opposition to Plaintiffs' suit and a desire for the suit to cease proceeding as a class action. Docket Entry #383. The Court ultimately finds this evidence insufficient to call into question the adequacy of Plaintiffs' representation.

To begin with, deposition testimony of four members of the proposed class who oppose inclusion in the class does not show significant dissent within the class. In a class the size of the one Plaintiffs propose, it would be surprising if there <u>were not</u> some members seeking to uncouple themselves from the claims of the named representatives. See <u>Horton v. Goose Creek Independent School Dist.</u>, 690 F.2d 470, 486 (5th Cir. 1982) (observing that "in any conceivable case, some members of the class will wish to assert their rights while others will not wish to do so"); <u>Wyatt by & Through Rawlins v. Poundstone</u>, 169 F.R.D. 155, 161 (M.D. Ala. 1995) ("[I]n large and complex litigation such as this one, potentially involving thousands of class members and scores of legal issues, many of them convoluted and difficult, it would be impossible to obtain and maintain 100% agreement within the class as to all matters."). The Defendants' proffered deposition testimony thus does not foreclose certification of the proposed class. Cf. <u>Smith v. Cardinal Logistics Mgmt. Corp.</u>,



No. 07-2104 SC, 2008 WL 4156364, at *7 (N.D. Cal. Sept. 5, 2008) ("[T]hat only three delivery drivers, out of 69 currently-employed drivers and a class of approximately 280 current and former drivers, are satisfied with their current employment arrangement does not, in this Court's view, constitute sufficient evidence of a conflict of interest to warrant a finding of inadequate representation.").

Similarly, the Court does not believe that the DIOA membership's votes in favor of Amendment Three and the Greenspace Fee foreclose certification of the proposed class. The Defendants argue that the Plaintiffs cannot adequately represent a class made up of individuals who voted for the policies the Plaintiffs seek to end. And the Court acknowledges that courts often deny class certification when presented with evidence that class members voted in favor of a challenged policy or action. See, e.g., Schy v. Susquehanna Corp., 419 F.2d 1112, 1117 (7th Cir. 1970) ("Since over eighty percent of the class voted in favor of the proposal of which the plaintiff's suit complains, and they did so with full knowledge of the plaintiff's suit, it is somewhat difficult for the plaintiff to claim that he represents the class."); Birnberg v. Milk St. Residential Assocs., Nos. 02-C-0978 and 02-C-3436, 2003 WL 21995177 at *3 (N.D. Ill. Aug. 20, 2003) (collecting cases and finding that "the majority of cases have held that . . . where there is a possibility that the other shareholders/class members would not want the transaction/merger voided, the named plaintiffs are not adequate representatives"). But the facts of the current case compel the Court to give little weight to the votes of the DIOA membership.

First, relying on the adoption of Amendment Three as evidence of class members' opposition to Plaintiffs' suit would be inappropriate because the Plaintiffs have alleged that the Defendants obtained the DIOA membership's approval of Amendment Three through the use of various

Page 26 of 40

misrepresentations and omissions. It would make little sense to foreclose the class mechanism to the losers of a vote when the legitimacy of the vote is itself in question. Cf. Horton, 690 F.2d at 486 ("Thus the familiar case of the stockholders' derivative suit is almost invariably brought by minority stockholders to challenge action that a majority of the stockholders approve. Yet it is routinely regarded as an appropriate class suit."). The DIOA members' vote approving Amendment Three, taken years before the Plaintiffs raised the allegations at issue in this action, is not evidence sufficient to establish that similar numbers of DIOA members continue to oppose the Plaintiffs' action.

Such concerns do not apply to the votes approving the Greenspace Fee; the DIOA membership approves the Greenspace Fee annually, as part of the DIOA budget, and has continued to do so even after the Plaintiffs initiated the instant lawsuit. Thus, one cannot say that these votes were taken in the absence of knowledge of the Plaintiffs' allegations. The mechanics of these votes, though, suggests that relying on them as a reliable indicator of opposition to the Plaintiffs' suit would be imprudent. Specifically, the Plaintiffs point out that the Greenspace Fee is not the subject of its own vote, but is instead a line-item in the overall budget for DIOA. And, the DIOA membership votes on the budget as a whole, and not on any particular item. Since a vote for an entire budget does not necessarily imply support for every item included in the budget, the Court finds that the continued approval of DIOA budgets that include the Greenspace Fee does not sufficiently evidence a conflict of interest such that class certification would be inappropriate. See Stolz v. United Bhd. of Carpenters & Joiners, 620 F. Supp. 396, 405 (D. Nev. 1985) ("Additionally, it is possible that the members which voted for the combined wage increase and dues check-off would have voted against the dues check-off if it had been proposed alone. . . . It is impossible to say, therefore, as defendants



contend, that all members which voted for the package are necessarily opposed to the plaintiff's position.").

Finally, the petition and letters proffered by the Defendants expose no fatal flaw in the Plaintiffs' attempt to certify the class. To wit, the petition and letters establish only that some residents of Dataw Island do not support the Plaintiffs' efforts in this case and seek exclusion from the Plaintiffs' proposed class. As the Court has already noted, this is unremarkable in a class the size of the one Plaintiffs propose. Moreover, while the Court recognizes that some courts have denied class certification when confronted with evidence of significant dissent within the class, the plaintiffs in many of those cases sought certification under Rule 23(b)(1) or 23(b)(2) – in such suits members do not have the right to exclude themselves from the action. See Pratt, 155 F.R.D. at 179 ("[The adequacy] requirement becomes especially important when certification pursuant to Rule 23(b)(2) is sought because absent members may not opt out of the class."). The Plaintiffs here seek certification under Rule 23(b)(3), and dissenting class members would have opt-out rights through which they could express their dissent. 1 Newberg on Class Actions § 3:30 (4th ed.) ("[D]issenting class members may opt out of the litigation, limiting the class to those who favor the suit."). Accordingly, dissension within the Plaintiffs' proposed class as to the propriety of the Plaintiffs' suit, whether evidenced by the petition and letters presented by Defendants, deposition testimony of absent class members, or otherwise, does not preclude certification of the class in this case. See 1 Newberg on Class Actions § 3:30 ("As a general rule, disapproval of the action by some class members should not be sufficient to preclude a class action on the ground of inadequate representation."); see also Lanner v. Wimmer, 662 F.2d 1349, 1357 (10th Cir. 1981) ("It is not fatal



[to class certification] if some members of the class might prefer not to have violations of their rights remedied." (quotation marks and citations omitted)).

ii.

As noted, disagreement within a proposed class over the propriety of a suit will not generally result in the denial of class certification. See Newberg § 3:30 ("Some courts have held that opposition to the suit . . . is not relevant to the class determination. In other words, the class member who wishes to remain a victim of unlawful conduct does not have a legally cognizable conflict with the class representative."). Conflicts of interest within the class are an entirely different matter, however. See, e.g., Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000) ("[A] class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class."). Here, the Court finds that several actual and potential conflicts of interest prevent certification of the Plaintiffs' proposed class.

The Court construes Plaintiffs' class claims as requesting three different forms of relief: (1) a declaratory judgment declaring Amendment Three invalid and an injunction prohibiting its enforcement; (2) a declaratory judgment declaring the Greenspace Fee invalid and an injunction prohibiting its enforcement; and (3) damages from DIC and the Individual Defendants for the diminution in property values that Plaintiffs claim class members experienced as a result of Amendment Three and Greenspace, as well as a return of DIC dues and assessments paid by DIC Social Members. As discussed below, certifying Plaintiffs' proposed class with respect to any of these forms of relief would create considerable actual and potential conflicts within the class.



First, Plaintiffs' desire to end enforcement of Amendment Three and the Greenspace Fee conflicts with the interests of many members of the Plaintiffs' proposed class who benefit from these policies. Plaintiffs' proposed class would consist of "all persons owning or purchasing property at Dataw Island from May 31, 2001 through the date of judgment." The proposed class thus includes those Dataw Island residents who are also golfing members of DIC. Including golfing members of DIC within the proposed class creates a clear conflict of interest, however, because this entire dispute revolves around Plaintiffs' claims that the golfing members of DIC are using Amendment Three and the Greenspace Fee to benefit themselves at the expense of other residents of Dataw Island. Specifically, the Plaintiffs allege that the One Island Concept – of which Amendment Three was an integral part – "has been used by DIC and the DIC and DIOA Boards as a vehicle for transferring funds from the DIOA membership to cover the costs of maintaining two 18-hole, championship-level golf courses at below market prices for members of the DIC." Docket Entry #45 at ¶ 90. With respect to the Greenspace Fee, Plaintiffs allege:

> 101. Substantial capital was raised by the Greenspace assessment in 2005, 2006, and 2007. Upon information and belief, the capital raised by the DIOA Greenspace Assessment in each year has been donated in full to the DIC to supplement its operations.

> 102. The promotional materials for the Greenspace Assessment represented that, in the absence of the assessment, "[g]olf membership dues would have to increase to an amount in excess of $500 per month if no reduction in the golf budget was made."

Id. at ¶¶ 101-102. In addition, the Plaintiffs submitted in support of their motion for class certification the expert report of Richard Livingston, in which Livingston concludes that equity members of the DIC benefitted from the imposition of Amendment Three and the Greenspace Fee. Docket Entry #272-20 at 4. It is hornbook law that class certification is not appropriate when



members of a proposed class benefit from the acts challenged by the class action. See Morris v. McCaddin, 553 F.2d 866, 870-71 (4th Cir. 1977) (finding no abuse of discretion in the district court's denial of class certification where "the interests of the named plaintiffs would have been antagonistic to the interests of many of the unnamed members of the class"); see also Bieneman v. City of Chicago, 864 F.2d 463 (7th Cir. 1988) (finding no abuse of discretion in denial of certification of all landowners near an airport because, while plaintiff claimed that the airport harmed property values, some landowners "undoubtedly derive[d] great benefit" from airport operations). Since the Plaintiffs' own allegations claim that Amendment Three and the Greenspace Fee operate to benefit a group of individuals who are also members of Plaintiffs' proposed class – DIC golfing members – this Court will not certify the class.

Plaintiffs acknowledge these conflicts, but then ask the Court to ignore them. Indeed, according to the Plaintiffs, these conflicts are not really conflicts at all – any prejudice that golfing members would suffer if the Plaintiffs succeed in obtaining their desired relief will be outweighed by the economic benefits, in the form of increased property values, that would accrue to all Dataw Island residents, including the golfing members of DIC. To support this claim, Plaintiffs cite to the Eleventh Circuit case of Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181 (11th Cir. 2003), arguing that Valley Drug establishes that a conflict only exists when members of the class will suffer a net economic prejudice if a suit succeeds.

Plaintiffs misapprehend the holding of Valley Drug. To the extent that Plaintiffs suggest that Valley Drug establishes that only net economic prejudice will establish a conflict sufficient to preclude class certification, Valley Drug does no such thing. Rather, Valley Drug merely points out that such a situation is one type of conflict that would make certification inappropriate. See Grimes



Page 31 of 40

v. Fairfield Resorts, Inc., 331 F. App'x 630, 633 (11th Cir. 2007) ("While it is true that in Valley Drug we held that class certification was inappropriate where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class, we have never held that only economic conflicts of interest will suffice to defeat certification." (emphasis in original) (internal quotation marks omitted)). Valley Drug did not express a new rule confining the adequacy analysis to determining whether the plaintiffs' action would cause some members of the class to suffer a net prejudice, but properly focused on whether the interests of the named representatives of the class "are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members." Valley Drug Co., 350 F.3d at 1189.

Moreover, Plaintiffs' net economic prejudice argument appears to assume that the only potential negative impact of the Plaintiffs' action on golfing members of the DIC would be an increase in their golfing dues and that this increase can neatly be set off against an equally determinable increase in these members' property values. The Court sees no evidence in the record suggesting that the impact of the Plaintiffs' action would be so limited. The Plaintiffs themselves have acknowledged that their action could impact golfing members of the DIC, not just by leading to an increase in dues, but by leading to the closure of portions of the golf courses on Dataw Island as well.[11] Moreover, the Plaintiffs' argument on this point seems to ignore the fact that the Plaintiffs

---

[11] In the hearing on this motion, for example, Plaintiffs' counsel listed the possibilities: "So they would lose $500 a year. And because there would be no more mandatory club membership, there is certainly a likelihood that the golfers would have to pay more dues or would have to pay more assessments or perhaps they would have to close some of the 36 holes on their golf courses." Docket Entry #387 at 16-17.



also seek to certify their antitrust claims, in which the Plaintiffs appear to claim class damages in excess of $30,000,000.  See Docket Entry #266-26.  The Plaintiffs also request treble damage liability under the federal antitrust laws.  See 15 U.S.C. § 15.  Such liability would likely cripple the DIC.  Thus, were the Plaintiffs to succeed in their class claims, golfing members of the DIC could face the prospect of the demise of the DIC as an ongoing entity.  This is clearly a conflict of interest within the proposed class.

Finally, the conflicts of interest within the Plaintiffs' proposed class are not just limited to the differences between golfing and non-golfing residents of the Island.  Indeed, the Plaintiffs' proposed class is made up of various groups which could potentially have differing interests in this litigation.  Plaintiffs' proposed class would include the following: (1) current residents of Dataw Island who purchased their property prior to May 31, 2001, and who thus allegedly suffered decreased property values due to the imposition of Amendment Three and the Greenspace Fee; (2) current residents who purchased their property between May 31, 2001 and December 19, 2005, who allegedly suffered decreased property values as a result of the imposition of the Greenspace Fee and DIC's increase in the initial contribution from $4,000 to $15,000; (3) current residents of Dataw Island who purchased their property after December 19, 2005; (4) former residents who purchased their property prior to May 31, 2001, and sold their property after May 31, 2001 at the allegedly decreased values associated with the contested policies; and (5) former residents who purchased their property between May 31, 2001 and December 19, 2005, and sold their property after December 19, 2005 at the allegedly further depressed property values.  Thus, one could broadly characterize the class as including current residents who claim that their values are depressed (Groups 1 and 2), current residents who purchased their properties at depressed prices (Group 3), and former residents



who sold their homes at allegedly depressed property values (Groups 4 and 5). After reviewing the record, the Court is convinced that these groups of potential class members present potential conflicts in remedial interests that are sufficient to defeat certification of Plaintiffs' proposed class. See Broussard v. Meineke Disc. Muffler Shops, 155 F.3d 331, 338 (4th Cir. 1998) (class certification inappropriate when "it is clear that the remedial 'interests of those within the single class are not aligned.'" (quoting Amchem Prods. v. Windsor, 521 U.S. 591, 625-26 (1997))).

First, Groups 4 and 5 would have an interest only in bringing a claim for, and maximizing, any damages that the Defendants would have to pay under the Plaintiffs' theories. These groups have already sold their properties; the only relief that would accrue to their benefit would be a money damages award compensating them for the difference between the actual selling prices of their properties and what the selling prices would have been in the absence of the contested policies. These groups certainly would have no interest in injunctive or declaratory relief, as such relief would only benefit current and future residents of the island.

It is easy to see how these interests could conflict with the interests of Groups 1, 2, and 3. DIC, the primary defendant in Plaintiffs' class claims, is the owner and operator of the recreational amenities on the island. These amenities include not just the two 18-hole golf courses, but also "a fitness club, swimming pool, eight tennis courts, and a community center." Docket Entry #266-2 at 4.) Indeed, the DIC provides some level of recreational opportunities to all current residents of the island who are also DIC members; it is reasonable to assume that many members of Groups 1, 2, and 3, as current residents of the island, have an active interest in ensuring that the DIC remains an ongoing enterprise so that they can continue to enjoy these amenities. There is a likelihood that this interest would manifest itself in a desire by these groups to limit the DIC's potential damages



exposure and focus instead on prospective relief in the form of a declaratory judgment and injunction.

Thus, the Court is presented with two groups with potentially conflicting interests. One group no longer has any relationship with the DIC; its interest lies solely in maximizing its damages award regardless of the potential impact on DIC's ability to operate in the future. The other group still resides on the island and continues to benefit from DIC's existence. This group clearly has an interest in ensuring DIC remains an ongoing enterprise. Under such circumstances, the Court finds that class certification would be inappropriate. See, e.g., Broussard, 155 F.3d at 338 ("[I]n making the class certification decision the district court might reasonably have been concerned that plaintiffs' residual, forward-looking interest, as current franchisees, in Meineke's continued viability would have tempered their zeal for damages and prejudiced the backward-looking interests of former franchisees."); Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A., 55 F.R.D. 26, 29 (S.D.N.Y. 1972) ("Plaintiff's interest as a former and terminated franchisee is not co-extensive and consistent with those of the present franchisees who, from all that appears in this record, presently depend upon the economic viability of the defendant.").

In summary, the Court finds that Plaintiffs' proposed class is riddled with conflicts. The Plaintiffs challenge policies that the Plaintiffs allege benefit members of the class. The Plaintiffs' proposed class is also made up of groups of potential plaintiffs with differing interests in this litigation. Former residents would want damages; current residents an injunction. And, the Court believes that the Plaintiffs' damages claims threaten the existence of the DIC itself, a result that surely conflicts with the interests of those residents of Dataw Island who currently utilize the various



amenities the DIC provides. Due to the existence of these various conflicts, Plaintiffs have failed

to satisfy Rule 23's adequacy requirement.

4.    Typicality

"The typicality requirement goes to the heart of a representative parties' ability to represent

a class, particularly as it tends to merge with the commonality and adequacy-of-representation

requirements." <u>Deiter</u>, 436 F.3d at 466. "[T]he appropriate analysis of typicality must involve a

comparison of the plaintiffs' claims or defenses with those of absent class members." <u>Id.</u> at 467.

"[P]laintiff's claim cannot be so different from the claims of absent class members that their claims

will not be advanced by plaintiff's proof of his own individual claim." <u>Id.</u> at 466-67. "Typicality

requires that the claims of the named class representatives be typical of those of the class; 'a class

representative must be part of the class and possess the same interest and suffer the same injury as

the class members.'" <u>Lienhart</u>, 255 F.3d at 146 (quoting <u>General Tel. Co. of Southwest v. Falcon</u>,

457 U.S. 147, 156 (1982)).

The Defendants argue in this case that the Plaintiffs cannot satisfy the typicality requirement

for several reasons. The following excerpt is representative of the Defendants' arguments with

respect to this issue:

> Plaintiffs' claims are not typical of the Putative Class. First, none of the named
> Plaintiffs owned properties at the time the Third Amendment was voted upon. They
> did not participate in this vote and were not part of the overwhelming majority of the
> Putative Class Members who owned property at the relevant time who voted in favor
> of the Third Amendment. They were not members of the DIOA at the time of the
> alleged breaches of fiduciary duties. The named Plaintiffs seek to undo and
> challenge the Third Amendment and Greenspace Line Item, although most Dataw
> Island owners voted in favor of these items. Moreover, the Plaintiffs do not even live
> on Dataw Island. As such, their positions cannot be "typical" of the average Dataw
> Island property owner. Plaintiffs are not "typical" of most of the Putative Class



Members. To the contrary, the named Plaintiffs are unusual when compared to the Putative Class Members, who expressed their desire to enact the challenged items. Plaintiffs are, therefore, not "typical" of the Putative Class.

Docket Entry #312 at 23-24.

None of the Defendants' arguments with respect to typicality relate to the Plaintiffs' claims or defenses. First, that none of the Plaintiffs owned property at the time of the Third Amendment vote is irrelevant because one set of the named plaintiffs – the Brandriffs – owned property before the Third Amendment became effective. Thus, they would be in a position to advance the claims of those members of the class who owned property prior to Amendment Three becoming effective – a group the Plaintiffs term the "Pre-One Island" plaintiffs. The Davenports, having purchased after Amendment Three became effective but before the increase in price of the initial contribution and the implementation of the Greenspace Fee, would advance the claims of the "Post-One Island" plaintiffs. Moreover, Defendants' claim that "Plaintiffs do not even live on Dataw Island" strikes the Court as irrelevant since there appears to be no dispute that the Plaintiffs own property on Dataw Island.

Ultimately, though, the Court finds that the same concerns that prevent a finding of adequacy in this case also prevent the Plaintiffs from satisfying Rule 23(a)'s typicality requirement. Here, the named Plaintiffs are current owners of property on Dataw Island; their interests are not typical of those members of the proposed class who no longer own property on the island. As noted above, proposed class members who are former residents of the island would have no interest in pursuing the equitable claims that Plaintiffs seek to certify. Yet, the named Plaintiffs' approach to this litigation suggests that those claims are their primary objective. For example, the Plaintiffs moved



for summary judgment on their claim for declaratory and injunctive relief with respect to Amendment Three approximately two-and-a-half months prior to moving for class certification of that same claim. This litigation approach suggests that the named Plaintiffs' primary concern is obtaining their own individual relief with respect to the challenged policies instead of advancing claims on behalf of the proposed class. Indeed, that the named Plaintiffs' primary concern is an injunction seems quite evident from Plaintiffs' counsel's statements to the Court during the hearing on this matter:

> And last, Your Honor . . . even if you deny class certification, these peoples' interests are still going to be impaired to the same extent, because Mr. Davenport, or probably more so, because Mr. Davenport and Mr. Brandriff are not going away. They are going to pursue this case and get their injunction. It doesn't matter if it's an injunction on behalf of the class or just them individually . . . .

Docket Entry #387 at 23-24. Of course, as noted, the Plaintiffs' interest in pursuing injunctive relief is of no benefit to those proposed class members who no longer reside on the island. Under such circumstances, the Fourth Circuit has suggested that class certification is not appropriate. See Broussard, 155 F.3d at 338-39.

### 5.    Conclusion

To conclude, the Court denies the Plaintiffs' motion to certify a class. The actual and potential conflicts within the Plaintiffs' proposed class are self-evident: (1) Plaintiffs seek to include in their proposed class Dataw Island residents who, according to the Plaintiffs' own allegations, benefit from the policies the Plaintiffs seek to dismantle; (2) Plaintiffs' inclusion in the class of both former and current residents of the island creates the potential for a serious conflict between former residents with an interest in maximizing a damages award against DIC and current residents who



continue to benefit from the amenities DIC provides; and (3) the named Plaintiffs' status as current

residents of the island calls into question their ability to fully represent the interests of former

residents who would have no desire for the equitable remedies that appear to be the named Plaintiffs'

primary focus. Thus, while the Court finds that the Plaintiffs have met their burden of satisfying

Rule 23(a)'s numerosity and commonality requirements, the Court concludes that the Plaintiffs have

failed to meet the adequacy and typicality requirements.[12] Because Plaintiffs' failure to satisfy all

four of Rule 23(a)'s requirements bars certification of the proposed class, the Court sees no need to

address Defendants' additional argument that class certification is inappropriate due to the Plaintiffs'

inability to meet the requirements of Rule 23(b)(3).

For the above reasons, the Plaintiffs' motion for class certification (Docket Entry #266) is

DENIED. The Defendants' motion for partial summary judgment (Docket Entry #207) is DENIED

as MOOT.

---

[12] In their pleadings, the Plaintiffs have at various times suggested that any potential conflicts within their proposed class can be alleviated through the use of Rule 23's opt-out mechanism. While the Court agrees that the opt-out mechanism might provide an adequate method of alleviating any potential conflicts posed by dissension within a class, the Court does not believe that the opt-out mechanism allows for a finding of adequacy in the presence of clear and actual conflicts of interest. See Gardner v. Equifax Info. Servs., LLC, No. 06-3102, 2007 U.S. Dist. LEXIS 57416 (D. Minn. 2007) ("The opt-out mechanism is not meant to ensure lack of conflict within the class by forcing a large number of individuals to affirmatively retain their legal rights or lose their claims. If this were the case, any person would be an adequate representative of a proposed class so long as there was an opt-out procedure, and there would be no need for an adequacy requirement."); Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co., 2003 U.S. Dist. LEXIS 25550 at *22-23 (S.D. Fla. 2003); Clark v. Experian Info. Solutions, Inc., 2001 U.S. Dist. LEXIS 20024 at *12-13 (D.S.C. 2001); Lukenas v. Bryce's Mountain Resort, Inc., 66 F.R.D. 69, 72 (W.D. Va. 1975) ("[T]he opt-out provisions of Rule 23(c)(2) may not be used to achieve compliance with the prerequisites of 23(a) . . . .").



**AND IT IS SO ORDERED.**

August 5, 2010

Charleston, South Carolina

C. WESTON HOUCK

UNITED STATES DISTRICT JUDGE