# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# BEAUFORT DIVISION

| | |
|---|---|
| Robert C. Brandriff; Kristen E. Brandriff; Richard K. Davenport; Mary E. Davenport ("Plaintiffs"), individually and derivatively on behalf of the Dataw Island Owners' Association, Inc. ("DIOA"); and Robert C. Brandriff; Kristen E. Brandriff; Richard K. Davenport; and Mary E. Davenport, individually and as representatives of a class;<br><br>Plaintiffs,<br><br>vs.<br><br>Dataw Island Owners' Association, Inc, nominal Defendant; Dataw Island Club, Inc.; Bruce "Skip" Adams; George Beck; Victor Brinkman; Colin Collins; Earl Dietz; Merwin "Mer" Grayson; Dan Hopkins; Herb Jarvis; John Mahoney; Colin McArthur; Peter Payne; John Payne; Bob Sanderson; Lee Scher; Deirdre Smith; Bob Spengler; Phil Sutphin; Ray Hoge; Pam Weigand; Jim Smithson; Peter Post; Roger Rittinger; Gabriel Nagy; Bob Albon; Larry Bernard; Harriette Buchanan; Gary Davis; Keith Dixon; Dan Frakes; Jack Hamilton; Jerry Hubbard; Gwen Jordan; Larry Lance; Terry Lurtz; Jim Marks; Jim McCornock; Bob Pogachnick; Bob Tisch; Richard Warden; Tom Fischer; Rick Manzari; Susan Beekman; Timothy McGrath; Joe Foutch; Thomas White; Herman Schmit; D. Pierre Cameron, Jr.; and William Bush;<br><br>Defendants. | Civil Action No.: 9:07-3361-CWH<br><br><br><br><br><br><br><br><br><br>**ORDER** |



Plaintiffs Robert C. Brandriff, Kristen E. Brandriff, Richard K. Davenport, and Mary E. Davenport bring this action against Defendants Dataw Island Club ("DIC"), individual members of DIC's board of directors ("DIC Board"), and several current and former members of the board of directors of the Dataw Island Owners' Association ("DIOA Board").

The Court assumes familiarity with the facts and procedural background of this case, which are thoroughly set forth in the Court's Order of August 6, 2010, denying the Plaintiffs' Motion to Certify Class, denying the Plaintiffs' Motion to Strike Certain Evidence Filed in Support of Defendants' Motion for Partial Summary Judgment as to Class Allegations, and denying the Defendants' Motion for Partial Summary Judgment as moot. (Docket Entry # 391).

In an apparent effort to convert a state law property and contract dispute into something more, the Plaintiffs have papered this case with allegations of antitrust violations and a RICO conspiracy.[1] This Court's jurisdiction is premised upon federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, and jurisdiction under the Class Action Fairness Act of 2005 pursuant to 28 U.S.C. §§ 1332(d)(2) and (6). (Docket Entry # 45, Verified Second Am. Compl. ¶¶ 6-9). The Court denied the Plaintiffs' motion to certify the proposed class (Docket Entry # 391), so jurisdiction now rests solely upon federal question jurisdiction arising from the Plaintiffs' federal antitrust claims (Verified Second Am. Compl., Counts IX-XI, ¶¶ 206-236) and supplemental jurisdiction.

---

[1] The Court declined to allow the Plaintiffs to amend their complaint for a fourth and fifth time to add Civil RICO claims among other amendments. (See Docket Entry # 391 at 9-10).



The parties have filed numerous and voluminous dispositive motions in this case. Having considered those motions, the Court rules as follows:

- The DIOA Defendants' Motion for Summary Judgment (Docket Entry # 209) is GRANTED with respect to Plaintiffs' federal antitrust claims (Counts IX-XI).

- The DIC and DIC Board Defendants' Motion for Summary Judgment (Docket Entry # 211) is GRANTED with respect to Plaintiffs' federal antitrust claims (Counts IX-XI).

In the absence of federal claims or a certified class, the Court concludes that it lacks jurisdiction over the remaining claims, declines to exercise its power of supplemental jurisdiction, and dismisses all remaining claims without prejudice. All other outstanding motions are MOOT.

## I. Standard of Review

"Summary judgment is appropriate when a party, who would bear the burden on the issue at trial, does not forecast evidence sufficient to establish an essential element of the case, such that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Wells v. Liddy, 186 F.3d 505, 520 (4th Cir. 1999) (internal citations and quotation marks omitted). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).



Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R .Civ. P. 56(e). Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Finally, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

## II. Discussion

Before discussing the details of antitrust law and its application to this case, the Court believes it will be helpful to clarify both the specific acts of the Defendants that Plaintiffs claim violate the antitrust laws and how those acts allegedly harmed the Plaintiffs. The Court understands this case to involve three distinct acts: (1) the passage of Amendment Three, which required that those who purchased Dataw Island property after May 31, 2001, also purchase a membership in DIC; (2) the increase in the DIC initial capital contribution, which occurred in December of 2005; and (3) the Greenspace Fee, which has been in existence since 2005.

The Brandriffs and the Davenports each have different theories about how these acts have injured them. Ultimately, both the Brandriffs and the Davenports assert the same three federal



antitrust claims against the DIC and the individual Defendants: (1) a tying claim under § 1 of the Sherman Act (Count IX), (2) a monopolization claim under § 2 of the Sherman Act (Count X), and (3) an exclusive dealing claim under § 1 of the Sherman Act (Count XI). To establish an antitrust violation, the Plaintiffs must prove "(1) a violation of the antitrust law, (2) direct injury to the plaintiff from such violations, and (3) damages sustained by the plaintiff." Deiter v. Microsoft Corp., 436 F.3d 461, 467 (4th Cir. 2006) (internal quotation marks and citations omitted).

### A. Tying

Plaintiffs claim that DIC and the individual Defendants have violated § 1 of the Sherman Act, 15 U.S.C. § 1, by instituting an illegal tying arrangement. "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 461 (1992) (internal quotation marks and citations omitted). A plaintiff asserting a per se tying claim under § 1 must prove the following four elements: "(1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce." Serv. & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 683 (4th Cir. 1992) (footnotes omitted). A plaintiff must also have standing to bring a private antitrust action. See Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 310 (4th Cir. 2007); Allen-Myland, Inc. v. IBM Corp., 33 F.3d 194, 201 (3d Cir. 1994) ("Finally, to



have standing to bring a private antitrust action, the plaintiff must show 'fact of damage,' defined as some harm flowing from the antitrust violation) (internal citations omitted).

As with the Plaintiffs' approach to many of the issues in this case, the Plaintiffs' reasoning behind their tying claims has evolved as this case has progressed. In the Second Amended Complaint, the Plaintiffs – both the Brandriffs and the Davenports – appear to advance the same ("traditional") theory of liability under § 1; specifically, they claim that Amendment Three and the Greenspace Fee constitute agreements conditioning the purchase of Dataw Island real estate on the purchase of a DIC membership. In subsequent filings, the Plaintiffs' theory changes. The Plaintiffs now advance a "locked-in aftermarket" theory of tying liability, and argue that this theory applies in distinctly different ways to the Brandriffs and Davenports.[2] This shift in theory ultimately makes little difference, though, because the Court finds that the Defendants are entitled to summary judgment on the Plaintiffs' § 1 tying claim regardless of which theory the Plaintiffs advance.

### 1. The Plaintiffs' Traditional Tying Theory

---

[2] The Brandriffs claim that the Defendants' acts injured them in the following ways. With respect to the passage of Amendment Three, the Brandriffs assert that it injured them by lowering their property values relative to communities that do not have a similar requirement. Similarly, they claim that raising the initial capital contribution fee from $4,000 to $15,000 furthered lowered their property values. Finally, with respect to the Greenspace Fee, they claim injury based both on the fact that they have to pay the fee as well as enduring any additional reduction in property values caused by its existence.

The Davenports challenge the same actions, but have different theories of injury. With respect to the initial imposition of Amendment Three, the Davenports do not bring a claim based on loss of property values. Rather, they seek reimbursement of the dues and assessments that they have paid to DIC because of their required membership. With respect to the increase in the initial capital contribution, their claim is similar to the Brandriffs' – that raising the contribution fee lowered their property values. Like the Brandriffs, they challenge the Greenspace Fee both because they pay the fee and because they claim it lowers their property values.



In their Second Verified Complaint, the Plaintiffs allege that Amendment Three and the Greenspace Fee constitute agreements conditioning the purchase of Dataw Island real estate on the purchase of a DIC membership. Under this theory, real estate on Dataw Island is the tying product and a DIC membership is the tied product.

To prevail on a tying claim, a plaintiff must establish that the defendant possesses sufficient economic power with respect to the tying product to restrain competition in the market for the tied product. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006). A plaintiff generally demonstrates market power by showing that the defendant possesses a predominant share of the relevant market. Eastman Kodak, 504 U.S. at 464.

"A relevant antitrust market has two distinct, but related, elements: (1) a relevant product market, and (2) a relevant geographic market." Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., 672 F. Supp. 1489, 1510 (D.S.C. 1987) (footnote omitted). The relevant product market is determined by "evaluating which products would be reasonably interchangeable by consumers for the same purpose." Brokerage Concepts v. U.S. Healthcare, 140 F.3d 494, 513 (3d Cir. 1998); Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc., 889 F.2d 524, 528 (4th Cir. 1989). The geographic market is determined by "considering the commercial realities faced by consumers." Double D Spotting Serv. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998). "It includes the geographic area in which consumers can practically seek alternative sources of the



product, and it can be defined as the market area in which the seller operates." Id. (internal quotation marks and citations omitted); Drs. Steuer & Latham, P.A., 672 F. Supp. at 1510 (observing that the geographic market is "the geographic area in which a purchaser can practically turn for products and services"). The burden is on the plaintiff to define both elements of the relevant market. Brokerage Concepts, 140 F.3d at 513; Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc., 714 F.2d 351, 355 (4th Cir. 1983).

In their Second Amended Complaint, the Plaintiffs do not specifically attempt to define the relevant product and geographic markets, but instead allege that "[t]he relevant market for antitrust purposes is residential real estate in the Dataw Island community." (Verified Second Am. Compl. ¶ 209). They also contend, "real property at Dataw Island is not subject to substitution by real estate in other areas," and thus conclude, "the DIOA possesses sufficient economic power in the Dataw Island residential real estate market to compel property owners and purchasers to buy memberships in the DIC or to contribute to the DIC even if these persons have no desire to make these purchases or contributions." (Id. ¶ 210). This theory appears to merge the product and geographic elements of the relevant market: by arguing that real estate in a particular area represents a unique product – Dataw Island real estate – the Plaintiffs appear to suggest that the geographic market is determined through reference to the product market. The uniqueness of Dataw Island property is the linchpin to this argument, and the Plaintiffs appear to have originally proceeded on the theory that Dataw Island property is unique and that this uniqueness establishes market power.

In some instances, the uniqueness of a product may provide sufficient market power to support a tying claim. See Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 86 (2d Cir.



2000), abrogated on other grounds by Swierkiewicz v. Sorema N. A., 534 U.S. 506 (2002). Additionally, "[w]here uniqueness is alleged, questions of market definition and market power will inevitably blend together because the relevant tying product market includes, by definition, only fungible products." Id. "If a defendant offers a unique and nonreplicable product . . . other products may not be adequate substitutes for it, and hence are not part of the same market." Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 479 (3d Cir. 1992) (footnote omitted). Still, the inquiry remains squarely grounded in the economic realities of the situation, and the boundaries of the market are determined by the interchangeability of the product with adequate substitutes for it. Hack, 237 F.3d at 86.

Here, all of the evidence in the record indicates that Dataw Island real estate is not so unique that there are no adequate substitutes for it. As the Defendants point out in their motions for summary judgment, the Plaintiffs' own experts admit that the relevant market, at a minimum, includes several comparable communities within the Beaufort area, and the evidence appears uncontradicted.[3] Even under this exceedingly narrow market definition, Dataw Island real estate

---

[3] In evaluating damages in this case, the Plaintiffs' own expert, Dr. Desvousges, examined property values on at least four other similar island communities located fairly close to Dataw Island: Cat Island, Fripp Island, St. James Plantation, and Callawassie Island. ("Property Damages Associated with Dataw Island Tying Arrangement," Final Expert Report of William H. Desvousges, Ph.D., Dec. 1, 2008, 1, attached to Pls.' Mem. in Opp'n to Dataw Island Club's and Individual DIC Defs.' Mot. for Summ. J., Docket Entry # 272 as Ex. A). Dr. Desvousges explains that he considered Cat Island, Fripp Island, and St. James Plantation because they are "located nearby and support a similar golf course style community." (Id. 4). Callawassie Island is also located near Dataw and offers "similar facilities." (Id.). The Defendants' expert contends that the relevant market is actually much larger; however, he notes that even if one limited the market to the four islands discussed by the Plaintiffs' expert, Dataw Island property would comprise "only about 17 percent" of the Plaintiffs' sample. (Report of Robert E. McCormick, Ph.D. 6). Additionally, the Defendants point to a 2005 consultant's study commissioned by the Dataw Island Club that shows "that *almost 40 percent* of all Dataw Island Club members moved from northeastern states (NY, PA, NJ, MA, & CT)." (Id. 7) (emphasis in original). The same



represents, at most, only around seventeen percent of the real estate in the market for comparable property. (Report of Robert E. McCormick, Ph.D., April 15, 2009, 6, attached to Defs.' Mot. for Summ. J. as Ex. F). This is clearly insufficient to support a finding of market power. Consumers who do not wish to buy DIC memberships can simply choose to purchase property in one of several other similar communities. Accepting as true the Plaintiffs' allegations that the Defendants control the housing market on Dataw Island, the Plaintiffs still cannot prevail on the tying theory advanced in the operative complaint because the Defendants lack sufficient economic power in the relevant tying market, identified as real estate in comparable communities.

### 2. The Plaintiffs' "Locked-In Aftermarket" Theory

In subsequent pleadings filed after the Second Amended Complaint, the Plaintiffs altered their theory of market power. The Plaintiffs now claim the Defendants possess sufficient economic power under the "locked-in aftermarket" theory of market power that the Supreme Court recognized in Eastman Kodak. According to the Plaintiffs, after purchasing property on Dataw Island, they were "locked-in" and thus unable to avoid the alleged tying arrangement.

After reviewing Eastman Kodak, the Court is convinced that the theory of market power recognized in that case is inapplicable to Plaintiffs' tying claims. In Eastman Kodak, the Supreme Court confronted an arrangement in which Kodak implemented a policy of selling replacement parts for its equipment only to third parties who agreed not to buy service from independent service

---

study reports that only eight percent of Dataw Island residents moved to the island from another location in South Carolina. (Id. 9). Given that the vast majority of Dataw Island residents moved from out of state, and many of them from a significant distance, it seems highly unlikely that those in the market for comparable real estate communities would consider only Dataw Island. Indeed, as noted by the Plaintiffs' expert, Dataw Island marketing materials state that "potential buyers 'look at competing communities in the Beaufort areas as well as several states away.'" (Final Expert Report of William H. Desvousges, Ph.D. 3).



organizations. 504 U.S. at 463. In other words, in order to purchase replacement parts, customers had to agree to use Kodak service or repair their own machines. Id. at 458. The Court found that there was sufficient evidence in the record that service and parts were two separate products and that Kodak's policies constituted an agreement conditioning purchase of a tying product (parts) on the purchase of a tied product (service). Id. at 462-63. The Court then turned to an analysis of whether there was evidence in the record sufficient to demonstrate Kodak's economic power in the market for Kodak parts.

Regarding its market power with respect to Kodak parts, Kodak argued that, even if it conceded that it had a monopoly share of the relevant parts market, it was still entitled to summary judgment because competition existed in a third market – the market for equipment. According to Kodak, parts and service were aftermarket products and "the brisk competition in the original market for the photocopy and micrographic equipment would prevent it from having market power in the aftermarkets for service and parts, even though it had a dominant share of those markets[.]" Maris Distrib. Co. v. Anheuser-Busch, Inc., 302 F.3d 1207, 1220 (11th Cir. 2002) (citing Eastman Kodak, 504 U.S. at 465-68). The Court rejected that argument, noting that high information and switching costs in the equipment market served to lock in customers of equipment. See Eastman Kodak, 504 U.S. at 476-78. In other words, Kodak could not point to brisk competition in the equipment market in order to get around its control of market share with respect to the tying product because customers purchasing the tying product were "locked-in" when they originally purchased Kodak equipment. Id.

An Eastman Kodak tying claim involves the purchase of a product in a competitive market that, because of high information costs and switching costs, enables a plaintiff to establish the



requisite market power in a derivative aftermarket for the <u>tying product</u>.  Importantly, the tying product and the lock-in product are <u>not</u> the same product.  <u>Eastman Kodak</u> involved three distinct products: "Kodak copiers (the 'lock-in' product), Kodak copier replacement parts (the tying product), and Kodak copier servicing and repair (the tied product)."  <u>Lee v. Life Ins. Co. of N. Am.</u>, 23 F.3d 14, 17 (1st Cir. 1994).

Under their <u>Eastman Kodak</u> theory, the Plaintiffs no longer appear to contest that Dataw Island real estate was sold in a competitive market.  Thus, the real estate itself <u>cannot be the tying product</u>.  By treating the real estate as the lock-in product, however, the Plaintiffs create a deficiency that is fatal to their tying claim – they no longer have a tying product.  In addition to this fundamental problem, the claims of both the Davenports and Brandriffs suffer from additional distinct but equally problematic flaws.  Each will be dealt with in turn.

### a. **The Davenports**

The Davenports purchased their property on Dataw Island on January 30, 2003, over a year and a half after the May 31, 2001, effective date of Amendment Three.  (Verified Second Am. Compl. ¶¶ 96, 86).  That the Davenports' tying claim merits summary judgment in favor of the Defendants is self-evident from the Plaintiffs' own memorandum in opposition:

> This argument misapprehends the antitrust claim of people buying property after May 31, 2001 [i.e., the Davenports].  [The Davenports] do not allege that post-One Island purchasers were injured by virtue of having to buy a product they did not want to buy. . . .  [The Davenports'] antitrust injury for purposes of standing is not the forced purchase of DIC memberships, but the loss in property values suffered as a result of the enforcement of changes in policy made by the DIC in 2005.

(Pls.' Mem. in Opp'n. to Dataw Island Club's and Individual DIC Defs.' Mot. for Summ. J. 9-10).

In other words, the Davenports do not attack the "tie" that required them to purchase a DIC



membership. Rather, they challenge changes in policy that occurred <u>after</u> they purchased the membership. This clearly is not a proper tying claim. See Queen City Pizza v. Domino's Pizza, 124 F.3d 430, 442-43 (3d Cir. 1997) ("The antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not, thereby restraining competition in the tied product market." (quoting Allen-Myland, 33 F.3d at 200)). Accordingly, the Davenport's tying claim fails.

### b. The Brandriffs

The Brandriffs purchased their property on Dataw Island on April 1, 2001, before Amendment Three became effective. (Verified Second Am. Compl. ¶ 97). Consequently, the Brandriffs were not required to purchase a DIC membership under the terms of Amendment Three. Like the equipment purchasers in Eastman Kodak, the Brandriffs claim they made a significant initial investment without notice of an impending change in policy affecting their investment. Unlike the equipment purchasers in Eastman Kodak, the Brandriffs neither purchased nor can identify a tying product over which the Defendants possessed market power. Instead, they argue that the alleged tying arrangement was "unique in that it did not require Pre-One Island Plaintiffs to *purchase* the tied product (DIC memberships)" but required them "to *sell* the tied product when they sold their property." (Pls.' Mem. in Opp'n. to Dataw Island Club's and Individual DIC Defs.' Mot. for Summ. J. 13) (emphasis in original). In other words, Dataw Island real estate is the "lock-in" product from the Brandriffs' perspective as property owners, but it is also the tying product from their perspective as potential sellers. The Plaintiffs contend that this "unique" tying arrangement "restrains competition on the merits in the tied product market in the same way as a



traditional tying arrangement – by allowing defendants to exploit their control over the tying product to force a sale of their tied market product." (Id.)

What is truly "unique" is the Plaintiffs' reading of the antitrust laws. The Court is referred to no authority under which similarly situated plaintiffs have been permitted to recover on such a theory. Furthermore, the restraint on competition that exists under a "traditional tying arrangement" is absent here. Forcing the Brandriffs to sell a tied product does not have the same anticompetitive effect as forcing them to buy a tied product because neither the Brandriffs nor any of the Defendants have market power over potential purchasers of the Brandriffs' real estate. These potential purchasers are in no way "locked-in"; if they want to buy real estate in a gated island community but do no wish to buy a DIC membership, they will simply buy property in one of the numerous other comparable communities that exist in the Beaufort area and elsewhere. Indeed, this appears to be precisely the Plaintiffs' grievance. Although this may be unfortunate for the Plaintiffs, it presents no antitrust problem. See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251-52 (7th Cir 1994) ("The claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up. . . . Plaintiffs, who want to obtain a [result] that will help them charge higher prices, have pleaded themselves out of court on the antitrust claim.") (internal citations omitted). In short, the Plaintiffs' efforts to recast their tying claim using the Eastman Kodak "locked-in aftermarket" theory fails for the same reason their traditional claim fails – a complete failure to forecast facts sufficient to show market power in the tying product.



### 3. The Greenspace Assessment

Both the Brandriffs and the Davenports also allege that the Greenspace fee that was imposed in 2005 is, in fact, nothing more than an effort to force them to purchase a DIC membership (the alleged tied product) and is, for that reason, a violation of the antitrust laws. (Pls.' Mem. in Opp'n. to Dataw Island Club's & Individual DIC Defs.' Mot. for Summ. J. 9-10). This argument misapprehends the way in which a true tying arrangement forces a party to purchase the tied product. In Eastman Kodak, Kodak equipment owners were forced to purchase service (the tied product) because it was the only way they could acquire Kodak parts (the tying product). See 504 U.S. at 458-59. The relevant force arose out of Kodak's control of the market for the tying product. Here, the requirement that the Plaintiffs pay the Greenspace Assessment arises not from their need to purchase an additional product the Defendants control, but from their obligations as property owners – obligations arising from contract or property law, not antitrust law.

For these reasons, the Plaintiffs have failed to allege facts sufficient to create a genuine issue of material fact as to the existence of an illegal tying arrangement. The Court grants the Defendants' motions for summary judgment with regard to Count IX of the Plaintiffs' Complaint.

### B. Illegal Monopolization

The Defendants are also entitled to summary judgment on the Plaintiffs' illegal monopolization claims. To prevail on a claim for illegal monopolization under 15 U.S.C. § 2, a plaintiff must establish two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). "Monopoly power requires . . .



something greater than market power under § 1." Eastman Kodak, 504 U.S. at 481. As detailed above, the Defendants lack market power for all relevant products in this case. It therefore follows that they cannot possess monopoly power in the markets for any of the relevant products. Accordingly, the Defendants are entitled to judgment as a matter of law on the Plaintiffs' illegal monopolization claims, and the Court grants the Defendants' motions for summary judgment as to Count X of the Plaintiffs' Complaint.

### C. Unlawful Exclusive Dealing

In Count XI of their Second Amended Complaint,[4] the Plaintiffs assert a claim of illegal exclusive dealing pursuant to 15 U.S.C. § 1. The Plaintiffs reason that as the result of Amendment Three, "DIOA sells purchasers of Dataw Island real estate memberships on the implied condition, agreement, and/or understanding that the purchasers shall deal in the club membership market exclusively with DIC." (Verified Second Am. Compl. ¶ 232). There is no evidence that any of the Defendants required any relevant party to agree not to deal with another party. At all times, the Plaintiffs were free to purchase property from whomever they chose and to join any club they desired. Simply put, there is no evidence whatsoever of any sort of "exclusive dealing" arrangement. The Court grants the Defendants' motions for summary judgment as to Count XI of the Plaintiffs' Complaint.

---

[4] Plaintiffs appear to have abandoned this claim in proposed amendments to their Complaint, and the parties provide little discussion on this issue in their memoranda in support or in opposition to summary judgment. However, as the Verified Second Amended Complaint remains the operative Complaint in this case, the Court will address the Plaintiffs' unlawful exclusive dealing claims in this Order.


Drawing all inferences in the light most favorable to the Plaintiffs, the Court concludes that summary judgment in favor of the Defendants is appropriate on the Plaintiffs' federal antitrust claims. The Plaintiffs have failed to forecast evidence sufficient to establish essential elements of their federal antitrust claims – namely that the Defendants possessed market or monopoly power in any of the relevant markets. A jury faced with such evidence could not reasonably find for the Plaintiffs. The Court GRANTS the Defendants' motions for summary judgment with regard to Counts IX-XI of the Complaint.

### III. Dismissal

Having granted the Defendants' motions for summary judgment on all three of the Plaintiffs' federal antitrust claims and having previously declined to certify the Plaintiffs' proposed class, the Court concludes it lacks original subject matter jurisdiction over the remaining claims. Title 28 U.S.C. § 1367(c)(3) provides, in pertinent part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." The Fourth Circuit has recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir.1995) (holding that the district court did not abuse its discretion in declining to retain jurisdiction over the state law claims). See also, e.g., United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726-27 (1966); Revene v. Charles Cnty. Comm'rs, 882 F.2d 870, 875 (4th Cir. 1989). Therefore, the Court declines to retain supplemental jurisdiction over any remaining state law claims and dismisses them without prejudice. All other outstanding motions are MOOT.



AND IT IS SO ORDERED.

_____
C. WESTON HOUCK
UNITED STATES DISTRICT JUDGE

September 30, 2009
Charleston, South Carolina